FABER CEMENT BLOCK CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4636–66.    Filed May 20, 1968.

*Samuel J. Foosaner*, for the petitioner.
*Gerald Backer*, for the respondent.

TANNENWALD, *Judge*: Respondent determined deficiencies in accumulated earnings taxes for the taxable years 1961, 1962, and 1963 in the respective amounts of $50,928.91, $34,317.22, and $55,824.07. The sole question for our consideration is whether petitioner was availed of for the purpose of avoiding Federal income taxes with respect to its shareholders.

FINDINGS OF FACT

Some of the facts have been stipulated. Those facts and the exhibits attached thereto are hereby incorporated by this reference.

Petitioner, Faber Cement Block Co., Inc. (hereinafter referred to as Faber Block), is a New Jersey corporation engaged in the business of manufacturing and selling cement and cinder blocks. It had its principal place of business at the time the petition herein was filed at Paramus, N.J. Petitioner's books and tax returns are kept and filed on the calendar year, accrual basis. Timely Federal corporate income tax returns were filed for 1961, 1962, and 1963 with the district director of internal revenue, Newark, N.J.

Beginning sometime around 1920, Albert J. Faber and Gerhardt P. Faber operated the business as a partnership with their father. In 1928, the partnership was incorporated. Since 1938, Faber Block has been located on Route 17, Paramus, N.J., approximately a mile and a half from its location prior to that time.

At all times material herein, Gerhardt P. Faber was petitioner's president, his wife, Elsie, vice president, and Albert J. Faber, secretary-treasurer, the latter being the chief administrative officer of the company. These three parties also made up petitioner's board of directors. Board meetings were sometimes attended by Emil M. Wulster and Samuel J. Foosaner, respectively, general and special tax counsel to petitioner before and during the years in issue. Foosaner prepared certain corporate minutes for board meetings held during such years.

Prior to 1958, the outstanding stock of Faber Block was held as follows:

| Stockholder | Number of shares | Percent |
|---|---|---|
| Albert J. Faber | 52. 5 | 50 |
| Gerhardt P. Faber | 35 | 33⅓ |
| Elsie Faber | 17. 5 | 16⅔ |

In 1958, a recapitalization of Faber Block was effected, resulting in three classes of authorized stock, as follows: 1,000 shares $100 par 6 percent cumulative preferred stock; 5,000 shares no-par class A common stock (voting); 4,000 shares no-par class B common stock (nonvoting). Under the new plan, voting privileges were vested exclusively in the class A stockholders. Preferred shareholders were to have preference upon liquidation to the extent of the par value of the stock plus any unpaid dividends. Thereafter, class A and class B shareholders would share ratably in the distribution. After payment of a 6-percent dividend on a cumulative basis to preferred shareholders, class A and class B holders were to be entitled on an equal basis to such dividends as the board of directors might declare. Pursuant to such plan, each share of old stock was exchanged for 10 shares of class A and 20

shares of class B. No preferred stock was ever issued. Immediately following the recapitalization, the issued and outstanding stock of petitioner stood as follows:

| Stockholder | Class A common (voting) shares | Class B common (nonvoting) shares |
|---|---|---|
| Albert J. Faber | 525 | 1, 050 |
| Gerhardt P. Faber | 350 | 700 |
| Elsie Faber | 175 | 350 |
| | 1, 050 | 2, 100 |

At the stated dates during the years in issue, the outstanding class B stock was held by the following individuals in the following amounts:

| Individuals [1] | Dec. 1, 1961 | Dec. 24, 1962 |
|---|---|---|
| Gerhardt P. Faber | 520 | 490 |
| Elsie Faber | 350 | 365 |
| Alan Faber | 180 | 195 |
| Albert J. Faber | 330 | 195 |
| Jesse Douglas | 72 | 87 |
| Marilyn G. Douglas | 72 | 87 |
| Jesse and Marilyn Douglas in trust for Calvin Douglas | 72 | 87 |
| Jesse and Marilyn Douglas in trust for Dana Lynn Douglas | 72 | 87 |
| Jesse and Marilyn Douglas in trust for Debra Ann Douglas | 72 | 87 |
| Doris Farrell | 72 | 87 |
| Christopher W. Farrell | 72 | 87 |
| Christopher W. and Doris Farrell in trust for Stephen Farrell | 108 | 123 |
| Christopher W. and Doris Farrell in trust for Donald Farrell | 108 | 123 |
| Total class B stock outstanding | 2, 100 | 2, 100 |

The Faber brothers had started in the cement and cinder block business on a part-time basis with very limited facilities. The business prospered, but, until late 1957, petitioner operated with hand machinery and increasingly inadequate facilities. Moreover, its equipment over the years, including the taxable periods involved herein, had been subjected to heavy use. In 1957, Faber Block opened expanded facilities at the same location in Paramus in order to meet the increasing demand for its products and to provide safer working conditions for its employees. Prior to such expansion, petitioner had been required to, and did, obtain a variance from the Paramus Zoning Board because of a local ordinance passed in 1956 which prohibited cement and cinder

[1] Gerhardt Faber, Elsie Faber, and Albert J. Faber are the individuals described above. Alan Faber is the son of Gerhardt Faber. Jesse Douglas and Marilyn G. Douglas, respectively, are the son-in-law and step-daughter of Albert J. Faber. Calvin Douglas, Dana Lynn Douglas, and Debra Ann Douglas are grandchildren of Albert J. Faber and children of Jesse and Marilyn G. Douglas. Christopher W. Farrell and Doris Farrell, respectively, are the son-in-law and daughter of Albert J. Faber. Stephen Farrell and Donald Farrell are the grandchildren of Albert J. Faber and the children of Christopher W. and Doris Farrell.

block manufacture, thus constituting petitioner's plant a nonconforming use.

Faber Block did a substantial amount of business in Rockland County, N.Y. In 1957, it decided to build a plant in Monsey, N.Y. Initially, the cost of such plant was estimated at approximately $500,000. Construction was commenced in 1959 and completed in 1960 at an approximate total cost of $450,000. Such construction was financed in part by an $85,000 mortgage, the entire amount of which was paid off within 2 years.

Beginning in 1961 and throughout the years in issue, plans for further expansion were discussed by the officers and directors of petitioner. The minutes of a board meeting held March 1, 1961, read:

Mr. Albert J. Faber stated, at the outset of the meeting, that the Company's expansion needs were such that consideration should be given to other possible sites on Route 17 for plant facilities if neighbors objections or other problems prevented new construction on the present site of the Company. The other Directors were in agreement with this thought and it was concluded that such investigation should be conducted.

The results of such "investigation" were enunciated in the minutes of a December 14, 1961, board meeting, where Albert Faber reported that he could find no property on Route 17 adequate to serve petitioner's needs unless it was willing to spend in excess of $400,000 for such land. The directors thereupon resolved to "make a further study of the possibility of expanding its plant facilities in either Monsey, N.Y., or Paramus, N.J., or in both locations, rather than seek new land at prohibitive costs at this time." The minutes of a board meeting on December 20, 1962, reflect further consideration of expansion plans with particular reference to the cost thereof based upon the statement of Albert Faber that "in his opinion, to provide the expansion of the plant facilities and the necessary new machinery and equipment could require somewhere between $500,000 and $750,000."

The minutes of a board meeting held December 19, 1963, contained a resolution to the effect that Faber Block proceed "to engage such expert assistance as might be necessary to prepare plans for expanding the plant facilities in Paramus, it appearing that Paramus was the most logical location." Petitioner had been somewhat skeptical about expanding the existing Paramus plant, mainly because it was a nonconforming use under the local zoning ordinance and, consequently, a variance had to be secured before any expansion could be undertaken. Despite the objections and resistance displayed by neighboring residents, Albert Faber was convinced that the necessary variance could eventually be obtained. He had discussed petitioner's proposed expansion at various times since 1961 with the Mayor of Paramus, who had recommended deferring application for a variance until local opposition had toned down.

In addition to plans for expansion of petitioner's plant, there was recognition of the need to acquire more modern equipment for existing facilities, as reflected in the minutes of meetings of petitioner's board of directors as follows:

Mar. 1, 1961_____ Four trucks plus ancillary equipment—no cost stated.
Mar. 28, 1962_____ Loader, cement bin and conveyor, trucks and trailers— estimated cost $85,100.
Oct. 3, 1962_____ Grinding machine and trucks—estimated cost $29,500.
Dec. 19, 1963_____ Review of acquisitions made during 1963 having an aggregate cost of $130,000.

Upon advice of its general counsel, petitioner embarked on a program of building up the commercial character of the property contiguous to the existing plantsite. It was hoped that such program would provide a "buffer zone" of friendly neighbors around petitioner's plant to counteract the pressure of complaining neighbors and thus help to change the tides of local opposition to the dust and noise emanating from petitioner's operations. Pursuant to this plan, additional land was purchased and developed for commercial tenants by Faber Bros., Inc. (hereinafter referred to as Faber Bros.), a New Jersey corporation whose stock was held 50 percent by Albert Faber and 50 percent by Gerhardt and Elsie Faber. The land acquired by Faber Bros. had a large potential future increase in value. Faber Bros. also owned the land upon which petitioner's plant was located and received rent therefor from petitioner. The "buffer zone" acquisitions were financed in part by interest-bearing loans from petitioner to Faber Bros. The outstanding principal balance on such loans at December 31, 1961, 1962, and 1963, was $155,000, $180,000, and $165,000, respectively. By December 31, 1966, the principal balance had been reduced to $80,000.

The following shows comparative balance sheets of Faber Bros. at December 31, 1961, 1962, and 1963 (rounded to the nearest thousand):

|  | 12/31/61 | 12/31/62 | 12/31/63 |
| --- | --- | --- | --- |
| Cash | $11 | $34 | $18 |
| Notes and accounts receivable | 1 | 3 | 8 |
| Buildings | 674 | 786 | 864 |
| (Reserve) | (189) | (211) | (239) |
| Land | 86 | 86 | 86 |
| Other assets | 5 | 6 | 9 |
| Total assets | 589 | 704 | 746 |
| Accounts payable |  |  | $2 |
| Federal income tax | $16 | $18 | 22 |
| Mortgages, notes, and bonds | 297 | 380 | 390 |
| Other liabilities | 6 | 11 | 6 |
| Capital stock | 32 | 32 | 32 |
| Earned surplus | 238 | 263 | 294 |
| Total liabilities | 589 | 704 | 746 |

The existence of local opposition to petitioner's facilities made it advisable for petitioner to move quietly and carefully in terms of obtaining permission of the zoning authorities for its expansion plans. In 1963, a beautification committee was formed in Paramus, the existence and operation of which helped pave the way for an easing of such opposition, since the proposed expansion would modernize and provide a better appearance and cleaner operation of petitioner's facilities on Route 17. In 1965, the local situation had clarified sufficiently, with the result that petitioner engaged architects to prepare plans for the expansion. The plans were completed in February 1966, at which time the desired variance was successfully obtained. Petitioner promptly proceeded to obtain a building permit and immediately thereafter initiated construction.

The cement and cinder block industry in the northern New Jersey area is highly competitive. Faber Block has enjoyed a most respected position in the industry. Architects on large jobs such as school construction often specified "Faber Cement Blocks or equal," and, in cases where petitioner has been the unsuccessful bidder for a particular job, the builder awarded the contract has on occasion come to petitioner to buy the particular type of block specified.

The building and construction industry requires a great number and variety of blocks. In 1957, when petitioner's expansion program first began, its production was limited to 20 types of blocks; now over 100 different types are produced. To meet the increasing demands of its customers, petitioner has attempted to acquire and utilize modern and efficient plant facilities, machinery, and equipment, consequently spending large sums annually towards such purpose. The following indicates capital acquisitions for the 10-year period 1957 through 1966:

| Year | Total acquisitions | Machinery and equipment | | Trucks and autos | | Extraordinary items (nonrecurring) |
|------|------|------|------|------|------|------|
| | | Paramus | Monsey | Paramus | Monsey | |
| 1957 | $53,182 | $12,238 | | $33,517 | | |
| 1958 | 111,865 | 71,379 | | 7,308 | | $32,793 (Bldg.—East Paterson) |
| 1959 | 124,379 | 85,730 | | 33,965 | | |
| 1960 | 433,018 | 26,414 | $211,758 | 11,200 | $30,106 | 145,849 (Plant bldg.—Monsey) |
| 1961 | 85,293 | 9,819 | | 64,857 | | |
| 1962 | 89,267 | 26,880 | | 56,462 | 2,760 | |
| 1963 | 154,345 | 108,461 | 12,462 | 13,832 | 10,761 | 7,603 (Plant bldg.—Monsey) |
| 1964 | 218,909 | 37,356 | 124,341 | 38,698 | | 10,194 (Plant bldg.—Monsey) |
| 1965 | 227,967 | 71,752 | 12,750 | 95,363 | 11,106 | 12,498 (Furn. and fix.—Paramus) |
| 1966 | 370,385 | 237,461 | 6,080 | 8,593 | 3,195 | 109,171 (New plant—Paramus) |
| | 1,868,610 | 687,490 | 367,391 | 363,795 | 57,928 | 318,108 |

Note: The difference of $73,898 between the amount of total acquisitions and the total of the other columnar amounts reflects other miscellaneous capital acquisitions during the years specified.

Total capital expenditures for January through May 16 and 17, 1967 (when the trial herein took place), were approximately $295,000. As of the latter date, petitioner had expended approximately $567,000 on its Paramus expansion program, which was scheduled for completion by the end of 1967 at a total final cost of between $650,000 and $700,000.

Throughout their experience in the block business, Albert and Gerhardt Faber have striven to maintain a "no-borrowing" policy, and, with limited exceptions, have managed to finance the business internally through earnings. In addition to the $85,000 mortgage secured in connection with the Monsey plant in 1960, petitioner in 1967, because of a shortage of cash, borrowed $200,000 in connection with the completion of the Paramus expansion program.

It has also been the policy of petitioner to pay its raw materials bills promptly in order to take advantage of cash discounts available upon early payment. The following reflects the data relevant to such practice during the years in issue:

| Year | Purchases | Discounts | Inventory | | Trade accounts receivable | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Jan. 1 | Dec. 31 | Jan. 1 | Dec. 31 |
| 1961 | $1,748,735 | $123,326 | $102,739 | $135,044 | NA | $412,534 |
| 1962 | 1,337,171 | 45,267 | 135,044 | 144,846 | $412,534 | 365,546 |
| 1963 | 1,363,587 | 49,005 | 144,846 | 141,132 | 365,546 | 445,213 |

For several years, including those in issue, petitioner has maintained for its employees a program of financial aid, pursuant to which loans (typically non-interest-bearing) are made to help employees through difficult periods or to enable them to purchase homes. Over the years, Faber Block has enjoyed a good relationship with its labor force and has experienced only a minimal amount of turnover.

Petitioner has also found it necessary to finance some of its customers for extended periods, sometimes as long as 120 to 150 days. A substantial portion of petitioner's accounts receivable is typically over 90 days old. Loans made by petitioner to customers were reflected by outstanding notes receivable totaling $63,781.65, $78,854.62, and $86,253.87 at December 31, 1961, 1962, and 1963, respectively. On infrequent occasions, petitioner has charged interest of 3 to 3½ percent on such loans.

In May 1960, following a trip to Germany by Albert Faber to investigate the cement-block truss industry, the Faber brothers and others connected with the block and building industries formed the United Filigree Truss Corp. (hereinafter referred to as United Filigree). United Filigree manufactured steel trusses which are used with cement blocks for roofing and flooring. Effective use of the truss serves to reduce the time and costs of construction. Petitioner, during the

years in issue, advanced substantial sums to United Filigree, which sums appeared as "Loans Receivable" on its balance sheet in the following amounts at the dates indicated:

| December 31— | Amount |
|---|---|
| 1961 | $30,000.00 |
| 1962 | 104,000.00 |
| 1963 | 84,564.30 |

Prior to 1966, petitioner owned no equity interest in United Filigree.

Beginning in 1959, petitioner started negotiations for the purchase of Hy-Way Cinder Block Co., Inc. (hereinafter referred to as Hy-Way Block). One James Swales, the owner of another New Jersey block company, agreed to join petitioner in the purchase of Hy-Way Block on a 50–50 basis. In late 1959, contracts for this proposed acquisition were prepared by petitioner's attorney. It was contemplated that the total purchase price would be $1 million, with $150,000 payable in cash and the remaining $850,000 payable over a period of 8 years with annual interest of 5 percent. Consummation of such agreement, however, was prevented because of internal strife between the related owners of Hy-Way Block—an uncle and his nephew. Throughout the years in issue, periodic discussions were held between the interested parties, but the uncle would not agree to sell. In 1964, the nephew began legal proceedings to force him to sell, but by this time Swales' interest in the venture had waned. Petitioner, however, did remain interested and continued negotiations in the hope that the family differences could be resolved. Counsel for Hy-Way Block last contacted petitioner with regard to the sale in 1967.

During the years in issue, the possible death of Albert Faber, petitioner's chief administrator, was of great concern. Albert suffered from recurring heart trouble, underwent major surgery as well as two minor operations which resulted in further complications and, between 1960 and 1963, was forced to spend a good deal of time in the hospital. On May 14, 1959, petitioner entered into a "Stock Retirement Agreement," the effect of which was to obligate the company, upon Albert's death, to purchase from his estate that portion of his interest in the corporation necessary to pay various death taxes. It was estimated that such agreement would ultimately cost Faber Block somewhere between $200,000 and $300,000. At least in part, the agreement was to be funded by a $20,000 insurance policy held by the corporation on Albert's life. The agreement was terminated pursuant to a corporate resolution on December 19, 1963.[2] On the same date, it was decided that steps should be taken to secure as much as $500,000 insurance on the lives of Albert

---

[2] There are indications in the record that a similar agreement existed between petitioner and Gerhardt and that this agreement was also terminated pursuant to the Dec. 19, 1963, resolution. But neither the agreement nor any of the details were submitted.

and Gerhardt in order to indemnify petitioner for financial loss upon the death of either and assist the survivor in the continued operation of the business. After investigating the matter, however, petitioner was unable to obtain the desired insurance.

The following schedule, compiled from petitioner's stipulated tax returns and other stipulated material, sets forth petitioner's pretax net income, Federal income tax liability, earned surplus account balance, and dividends declared and paid for the years indicated:

| Year | Pretax net income [1] | Federal income tax [1] | Earned surplus Dec. 31 [1] | Dividends | |
|---|---|---|---|---|---|
| | | | | Class A | Class B |
| 1957 | $255,400 | $126,000 | $1,136,400 | $35,175 | ---------- |
| 1958 | 185,000 | 90,700 | 1,210,000 | 20,000 | ---------- |
| 1959 | 281,200 | 140,800 | 1,346,400 | ---------- | $10,500 |
| 1960 | 175,900 | 86,000 | 1,426,300 | ---------- | 10,500 |
| 1961 | 346,700 | 174,500 | 1,598,200 | ---------- | 10,500 |
| 1962 | 265,300 | 127,900 | 1,716,500 | ---------- | 10,500 |
| 1963 | 351,200 | 167,100 | 1,889,100 | ---------- | 10,500 |
| 1964 | 255,800 | 107,300 | 2,015,600 | 5,250 | 15,750 |
| 1965 | 348,700 | 149,600 | 2,197,900 | ---------- | 15,750 |
| 1966 | 362,200 | 158,000 | 2,385,200 | ---------- | 15,750 |

[1] Rounded to the nearest hundred.

Prior to 1957, no dividends were paid by petitioner.

Comparative abbreviated balance sheets and income statements per petitioner's books (in thousands of dollars) for the years in issue were as follows:

| Balance Sheets at December 31— | | | | | |
|---|---|---|---|---|---|
| | 1961 | | 1962 | | 1963 |
| Cash | $219.2 | | $300.6 | | $319.6 |
| Trade accounts receivable | 412.5 | | 365.5 | | 445.2 |
| Notes receivable | 63.8 | | 78.8 | | 86.3 |
| Loans receivable | 190.3 | | 294.7 | | 264.2 |
| U.S. Treasury notes | 65.2 | | ---------- | | 75.8 |
| Inventories | 135.0 | | 144.8 | | 141.1 |
| Other current assets | 27.3 | | 15.8 | | 19.5 |
| Total current assets | 1,113.3 | | 1,200.2 | | 1,351.7 |
| Cash surrender value life insurance | 11.6 | | 12.4 | | 13.2 |
| Mortgages receivable | 23.9 | | 25.4 | | 25.9 |
| Fixed assets | $1,580.2 | $1,639.1 | | $1,730.6 | |
| Accumulated depreciation | (794.9) 785.3 | (897.4) | 741.7 | (975.5) | 755.1 |
| Total assets | 1,934.1 | | 1,979.7 | | 2,145.9 |
| Current liabilities | 325.4 | | 252.8 | | 246.3 |
| Capital stock | 10.5 | | 10.5 | | 10.5 |
| Earned surplus | 1,598.2 | | 1,716.4 | | 1,889.1 |
| Total liabilities and capital | 1,934.1 | | 1,979.7 | | 2,145.9 |

| Income statements | | | |
|---|---|---|---|
| | 1961 | 1962 | 1963 |
| Net sales | $3,048.3 | $2,707.7 | $2,933.5 |
| Cost of sales | 2,570.8 | 2,214.5 | 2,339.4 |
| Gross profit | 477.5 | 493.2 | 594.1 |
| General and administrative expense | 272.1 | 293.7 | 312.9 |
| Net profit—operations | 205.4 | 199.5 | 281.2 |
| Other income | 140.5 | 64.9 | 69.0 |
| Net profit—pretax | 345.9 | 264.4 | 350.2 |
| Provision for income tax | 174.5 | 127.9 | 167.1 |
| Net profit to surplus | 171.4 | 136.5 | 183.1 |

Petitioner's needs for working capital were $432,000 at the end of 1961, $473,000 at the end of 1962, and $503,000 at the end of 1963. See page 331, *infra*.

Prior to mailing the notice of deficiency on May 27, 1966, respondent sent, by certified mail on July 8, 1965, a notification under section 534(b) of the Internal Revenue Code, informing petitioner that the proposed notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531. Petitioner did not respond to this request within 60 days thereafter, and no response was received prior to the issuance of the statutory notice. In the statutory notice herein, respondent computed the deficiencies in accumulated earnings tax on the basis of petitioner's entire undistributed earnings and profits for the years 1961, 1962, and 1963 in the respective amounts of $160,854.22, $117,707.07, and $173,569.

Joint Federal income tax returns filed by Gerhardt and Elsie Faber for the years in issue showed net taxable income for the taxable years 1961, 1962, and 1963 of $52,751.78, $68,206.79, and $62,386.96, respectively.

Joint Federal income tax returns filed by Albert and Marion Faber for the years in issue showed net taxable income for the taxable years 1961, 1962, and 1963 of $37,754.69, $60,156.88, and $58,616.87, respectively.

OPINION

Once again we are called upon to determine whether a closely held corporation has been availed of by its shareholders for the purpose of avoiding personal income tax via improper accumulations of earnings

and profits.[3] While the proscribed purpose of tax avoidance must be found in every such case, section 533(a) provides that, unless petitioner can prove to the contrary by a preponderance of the evidence, the very fact that its earnings and profits were permitted to accumulate "beyond the reasonable needs of the business" will be determinative of such purpose. Section 537 defines the term "reasonable needs of the business" to include the *reasonably anticipated* needs of such business. By complying with certain statutory conditions prescribed in section 534, the petitioner in an accumulated earnings case may shift the burden of proof regarding reasonable needs to respondent. But petitioner herein has not attempted to meet these requirements and must thus bear the burden.

Before analyzing whether petitioner was justified in retaining its earnings and profits during the years involved herein to meet the reasonable needs of its business, we consider one of the two main arguments advanced by respondent, namely, his suggestion that, through various devices allowable under the tax laws, petitioner could have declared a taxable dividend to its shareholders without disturbing its "quick asset" position. In this connection, it is urged that (1) the indebtedness of Faber Bros. could either have been distributed in kind to its shareholders or canceled by petitioner and thus contributed to the capital of Faber Bros.; (2) the indebtedness to United Filigree could similarly have been distributed; and (3) authorized, but unissued, preferred stock could have been issued as taxable dividends. In view of such possibilities, respondent, relying heavily upon *Nemours Corporation*, 38 T.C. 585 (1962), affirmed per curiam 325 F. 2d 559 (C.A. 3, 1963), and *Whitney Chain & Mfg. Co.*, 3 T.C. 1109 (1944), affirmed per curiam 149 F. 2d 936 (C.A. 2, 1945), concludes that the needs of petitioner's business did not require an accumulation of earnings and profits and the proposed deficiencies should be sustained.

We think the focus of respondent's view of an unreasonable accumulation of earnings and profits situation is distorted. Under the applicable statute, the central issue is the reasonable needs of the business. If available assets are required to meet such needs, the mere fact that some of those assets could be used for dividends without impairing current business operations is beside the point. In short, the presence of such assets is not in and of itself determinative of an unrea-

---

[3] SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.

(a) GENERAL RULE.—The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.

All future references hereinafter are to the Internal Revenue Code of 1954.

sonable accumulation of earnings and profits and neither *Nemours* nor *Whitney Chain* holds or implies otherwise. In both of those cases, this Court, after a careful analysis of all the elements involved, decided that the challenged accumulated earnings and profits were in fact not needed for the reasonable needs of the business. Against this background, we looked to potential sources for dividends and concluded that, even though it may have been necessary for the taxpayers to retain assets normally characterized as "liquid assets" (e.g., cash), other non-liquid assets not needed in the business—in the form of non-interest-bearing loans to shareholders—were readily available for dividend distributions. Essentially, what we did in *Nemours* and *Whitney Chain* was to treat the loans to shareholders as "liquid assets" in the course of determining whether a taxpayer whose accumulated earnings and profits had been found to be beyond its business needs had the necessary wherewithal to pay dividends. Such an approach is entirely consistent with the rationale of the decided cases in this area to the effect that it is the nature of assets to which the accumulated earnings and profits are committed, rather than the mere monetary size of such accumulations, which controls. *Smoot Sand & Gravel Corporation* v. *Commissioner*, 274 F. 2d 495, 500–501 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court; *John P. Scripps Newspapers*, 44 T.C. 453, 467 (1965).

In this context, the significance of the outstanding loans receivable from Faber Bros. and United Filigree lies exclusively in the realm of considering their relationship to the needs of petitioner's business or, if such relationship does not exist, their treatment as part of the "liquid assets" whose retention must be justified in terms of the total needs of the business—considerations to which we shall return later in this opinion.[4] With respect to the argument that petitioner's authorized but unissued preferred stock could have been used to pay a taxable stock dividend under section 305, to the extent of petitioner's accumulated earnings and profits, we think that respondent has clearly overreached himself. Here again, his initial focus is erroneously on the availability of a means for distributing dividends rather than the reasonable needs of the business. Beyond this, if we were to accept his argument, we doubt that there would ever be a case where, either within its existing capital structure or through appropriate amendment to its charter, a corporate taxpayer would not be able to declare a taxable stock dividend within the specifications of section 305. We

---

[4] See p. 334, *infra*. As a matter of logic, if respondent's theory were correct, the fact that such loans were fully justified by business considerations would realistically be immaterial, since, even under such circumstances, they could readily be utilized for dividend distributions.

are not prepared to accord respondent such an antimissile missile to overcome proof by taxpayers that accumulated earnings and profits were required by the reasonable needs of the business.

We now turn to the critical question involved herein, namely, whether petitioner's accumulated earnings and profits were sufficiently committed to assets currently tied up in its business and required to meet the reasonably anticipated needs of its business so as to justify the conclusion that the surtax on such earnings and profits should not be imposed. Noting that the question of whether accumulations go beyond the reasonable needs of a business (including reasonably anticipated needs) involves essentially a factual determination (*Helvering* v. *National Grocery Co.*, 304 U.S. 282 (1938); *Estate of Goodall* v. *Commissioner*, 391 F. 2d 775 (C.A. 8, Mar. 5, 1968), modifying a Memorandum Opinion of this Court), we think the accumulations herein did not exceed such needs during the years involved.

We are not unmindful that, in the first instance, it is for the corporate officers and directors to determine the reasonable needs of a particular business. Consequently, we are reluctant to substitute our business judgment for that of corporate management unless the facts and circumstances, buttressed (in the absence of a proper statement under section 534) by the presumptive correctness of respondent's determination, dictate that we should do so. *Bremerton Sun Publishing Co.*, 44 T.C. 566, 583 (1965); *F. E. Watkins Motor Co.*, 31 T.C. 288, 300 (1958).

There is little doubt but that, through consistently successful operations, petitioner had accumulated a substantial surplus and continued to prosper during, and subsequent to, the years involved herein. For the years here relevant, its net income after taxes was $172,197 (1961), $137,419 (1962), and $184,069 (1963), and its earned surplus account showed beginning balances of $1,426,259 (1961), $1,598,186 (1962), and $1,716,486 (1963). As we have previously pointed out, however, the critical factor is not the monetary size of the accumulated earnings and profits but the liquid position of the tax payer and the relation of that position to current and anticipated needs. See page 327, *supra*.

In this vein, as to the outstanding loans receivable from Faber Bros. and United Filigree, the evidence in support of their relationship to the business requirements of petitioner is far from clear. With respect to the loans to Faber Bros., while there was some general testimony about the hoped-for benefit to petitioner from a "buffer zone" of friendly tenants, it seems clear that the potential future increase in the value of the land acquired was large and that the benefit from such increase to Albert, Gerhardt, and Elsie as the shareholders of Faber Bros. was, in all likelihood, a strong motivating factor for the acquisi-

tions.[5] With respect to the loans to United Filigree, Albert testified that they were made "more or less not for ourselves (petitioner) as much as * * * for the association (members of the cement block and building industries)." Moreover, even if these loans were business related at the time they were made, it does not necessarily follow that they can never be considered as liquid assets available to meet the reasonable needs of the business. In this connection, we note that petitioner itself considered them as current assets. In any event, for purposes of decision, we will assume that these loans were liquid assets.[6]

Because it will similarly not affect our conclusion herein, we will make the further assumptions against petitioner that, as reflected on its balance sheets, all of the items listed as current assets, the cash surrender of life insurance, and the mortgages receivable should be considered as part of petitioner's liquid position for the purpose of determining availabilities for meeting business needs. On this basis, petitioner's liquidity position as of December 31 of each of the years involved herein was as follows (in thousands):

|  | 1961 | 1962 | 1963 |
|---|---|---|---|
| Current assets | $1,101.7 | $1,200.2 | $1,351.7 |
| Cash value–life insurance | 11.6 | 12.4 | 13.2 |
| Mortgages receivable | 23.9 | 25.4 | 25.9 |
| Total | 1,137.2 | 1,238.0 | 1,390.8 |
| Less: Current liabilities | 325.4 | 252.8 | 246.3 |
| Total availabilities | 811.8 | 985.2 | 1,144.5 |

Having thus determined availabilities, we now turn our attention to the offsetting reasonable needs of petitioner's business. While petitioner claimed a variety of factors as giving rise to such needs, as we view the situation, it will suffice to concentrate on only some of them:

1. *Working-Capital Needs.*—Respondent's regulations specifically provide that earnings may be retained to provide for working capital requirements. Sec. 1.537–2(b)(4), Income Tax Regs. While neither of the parties directed their attention at the trial to the question of petitioner's working-capital requirements, we think it obvious that such requirements existed during the taxable years at issue. On brief, respondent calculated petitioner's need for working capital at $513,957 at the end of 1961, $462,384 at the end of 1962, and $490,957 at the end of

---

[5] The making of these loans suggests "constructive dividend" overtones, but neither that issue nor the proper taxpayers, against whom such a contention could be asserted, are involved herein.

[6] Cf. *Bardahl Manufacturing Corp.*, T.C. Memo. 1965–200. The rationale for such treatment is to equate the loans receivable with cash and accord the petitioner no better or worse treatment than it would encounter if it actually had an equal amount in cash. Cf. *Sterling Distributors, Inc. v. United States*, 313 F. 2d 803, 808 (C.A. 5, 1963).

1963. Our own calculations, in terms of expected costs for a single "operating cycle" under the so-called *Bardahl* formula are approximately the same [7]—$432,000 (1961), $473,000 (1962), and $503,000 (1963). *Bardahl Manufacturing Corp.*, T.C. Memo. 1965–200; cf. *United States* v. *McNally Pittsburg Manufacturing Corp.*, 342 F. 2d 198 (C.A. 10, 1965). See generally, Luria, "The Accumulated Earnings Tax," 76 Yale L. J. 793 (1967); Ziegler, " 'New' Accumulations Earnings Tax: A Survey of Recent Developments," 22 Tax L. Rev. 77, 91 (1966).

*2. Proposed Plant Expansion.*—Respondent contends that, during the years here relevant, petitioner did not have adequate plans for plant expansion in the claimed amounts of $500,000 to $750,000 so as to fall within the scope of section 537 and the regulations thereunder. We disagree.

Section 537 was designed to enable a corporation to accumulate earnings and profits without investing them immediately, "so long as there is an indication that future needs of the business require such accumulation." See S. Rept. No. 1622, 83d Cong., 2d Sess., pp. 317–318 (1954). The committee reports also state that "where the future needs of the business are uncertain or vague, or the plans for the future use of the accumulations are indefinite, the amendment does not prevent application of the accumulated earnings tax." See S. Rept. No. 1622, *supra* at 69; H. Rept. No. 1337, 83d Cong., 2d Sess., p. 53 (1954). Such plans, according to respondent's regulations, must be "specific, definite and feasible." Sec. 1.537–1(b)(1), Income Tax Regs. Under the particular circumstances herein, we think that petitioner has met these requirements.

---

[7] See the following table:

| | 1961 | 1962 | 1963 |
|---|---|---|---|
| Average inventory | $119 | $140 | $143 |
| Cost of goods sold (less depreciation) | 2,442 | 2,087 | 2,215 |
| Inventory turnover | 20.5 times | 14.8 times | 15.5 times |
| Operating cycle [1] | 17.5 days | 24.3 days | 23.2 days |
| Average accounts receivable | 348 | 389 | 405 |
| Net sales | 3,048 | 2,707 | 2,933 |
| Receivables turnover | 8.8 times | 7.5 times | 7.2 times |
| Operating cycle [1] | 40.9 days | 48.0 days | 50.0 days |
| Total operating cycle [1] | 58.4 days | 72.3 days | 73.2 days |
| Cost of goods sold (as above) | 2,442 | 2,087 | 2,215 |
| Other operating expenses (less bad debts) | 259 | 277 | 298 |
| Total expenses | 2,701 | 2,364 | 2,513 |
| Operating cycle percent of 1 year [1] | 16 percent | 20 percent | 20 percent |
| Working capital needs | $432 | $473 | $503 |

[1] Based on a 360-day year.

Because its operations constituted a nonconforming use under the local zoning ordinance, petitioner was faced with practical difficulties regarding expansion at the existing site in Paramus. Such difficulties, however, were not insurmountable, as is indeed attested to by the fact that in 1957 a variance to build a new plant had been secured under the same ordinance. By proceeding patiently and by carefully timing their application for a variance, the Fabers had good reason to believe that they would ultimately secure permission again to expand. In point of fact, this is precisely what happened, for in 1966 the desired variance was granted. Admittedly, such variance might not have been granted. Yet, the mere fact that expansion plans are contingent upon the outcome of certain local political action will not result in a blanket bar of accumulations made pursuant to such plans. Cf. *Sterling Distributors, Inc.* v. *United States*, 313 F. 2d 803 (C.A. 5, 1963). Taking note of the fact that local zoning matters typically abound with political nuances, we do not think it our province to second-guess the optimism of the Fabers, especially when we are not even in a position to claim the benefit of hindsight.

Concededly, a finding that petitioner reasonably expected to secure a variance does not of itself guarantee that the expansion would in fact take place. Thus, respondent suggests that the variance obstacle was set up as a convenient smokescreen behind which petitioner could accumulate substantial earnings without ever having any fixed intention to use such accumulations when and if the smoke cleared.

Unquestionably, as respondent points out, the minutes relating to the proposed plans for expansion are flavored with tax planning; they were concededly prepared by petitioner's tax counsel and are replete with boilerplate statements which exude concern over the possible assertion of an unreasonable accumulation challenge. But the aura of tax consciousness does not destroy the fact that the minutes contain evidence of plans to expand. Contrariwise, these minutes in and of themselves will not serve to immunize petitioner. Mere words in corporate minutes, if unsupported by further evidence of actual implementation, or the likelihood thereof, will carry little weight.

We also recognize that petitioner's plans for expansion were not set forth in the minutes or other documentary material with precision or in detail. But the requirement of "specific, definite, and feasible" plans does not demand that the taxpayer produce meticulously drawn, formal blueprints for action.[8] *John P. Scripps Newspapers, supra* at 469. The test is a practical one, namely, that the contemplated expansion appears to have been "a real consideration dur-

---

[8] For petitioner to have prepared blueprints and detailed budgets before the granting of the variance appeared imminent could well have entailed unnecessary time and expense. Cf. *Sterling Distributors, Inc.* v. *United States*, 313 F. 2d 803, 807 (C.A. 5, 1963).

ing the taxable year, and not simply an afterthought to justify challenged accumulations." See *Smoot Sand & Gravel Corporation* v. *Commissioner*, *supra* at 499. The decided cases, which admittedly cover a variety of factual situations, indicate that in applying this test the courts primarily take into account evidence of actual implementation in evaluating the specificity of plans as they existed during the critical period, provided that some evidence of plans is adduced. Compare and contrast *F. E. Watkins Motor Co.*, 31 T.C. 288 (1958), and *Breitfeller Sales, Inc.*, 28 T.C. 1164 (1957), with *Barrow Manufacturing Co.* v. *Commissioner*, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court, *Dixie, Inc.* v. *Commissioner*, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), *I. A. Dress Co.* v. *Commissioner*, 273 F. 2d 543 (C.A. 2, 1960), affirming 32 T.C. 93 (1959), and *American Metal Products Corporation* v. *Commissioner*, 287 F. 2d 860 (C.A. 8, 1961), affirming 34 T.C. 89 (1960).

We are satisfied on the basis of the record herein that (1) petitioner had plans to expand well before the end of 1961, the first taxable year involved herein; (2) the prospective cost of such expansion was between $500,000 to $750,000; (3) a reasonable need for such expansion did in fact exist; and (4) active steps were in fact intended to be taken [9] during the years in issue to implement the announced objectives.

Further, we are satisfied that sufficient steps were in fact taken by petitioner towards implementing the proposed expansion. Most significant in this regard is the fact that petitioner actively sought out alternatives to expanding the existing Paramus plant, fully aware that the zoning board might not act favorably. For various reasons, such alternatives were rejected, but it was not until they had been exhausted that petitioner finally designated the existing plant site in Paramus as the locus for expansion. Under the circumstances, the fact that the exact location of the proposed expansion was temporarily unknown has little significance.

Finally, we cannot and will not ignore the ultimate fruition of petitioner's expansion plans—accomplished within a reasonable time after the years in question at a cost closely in line with the amount originally estimated. While not controlling, evidence of what petitioner in fact did in subsequent years certainly affects the weight to be given its declared intention during the years in issue. See *Dixie, Inc.* v. *Commissioner*, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958);

---

[9] We are unimpressed with respondent's argument that Albert Faber was petitioner's "most valuable asset" and that the possibility of his death, because of admittedly poor health, made expansion unlikely. Aside from the macabre and speculative nature of his argument, we are satisfied that Gerhardt Faber had a sufficient degree of knowledge and capability to carry on the business, especially when the increased demand for petitioner's product and the bright prospects for the future, as they existed during the years in issue, are considered.

sec. 1.537–1(b)(2), Income Tax Regs.; cf. S. Rept. No. 1622, *supra* at 70; H. Rept. No. 1337, *supra* at 53.

*3. Machinery and Equipment.*—Clearly petitioner had continuing need for funds to cover substantial annual outlays for additional and replacement machinery and equipment. Upon the basis of the amounts of these items as contemplated to be and in fact purchased, we think it reasonable to allocate $100,000 annually out of availabilities for this purpose.

At this point, if we compare petitioner's availabilities (p. 330, *supra*) with the indicated needs heretofore discussed, the following picture results:

| | 1961 | 1962 | 1963 |
|---|---|---|---|
| Availabilities | $811.8 | $985.2 | $1,144.5 |
| Needs | | | |
| Working capital [10] | $432 | $462 | $490 |
| Plant expansion | 750 | 750 | 750 |
| Machinery and equipment | 100 | 100 | 100 |
| Totals | $1,282.0 | $1,312.0 | $1,340.0 |
| Deficiency in availabilities | ($470.2) | ($326.8) | ($195.5) |

Thus, petitioner had far less availabilities than were required to meet the current and future reasonable needs of its business as they existed during the years at issue. The deficit in these availabilities was sufficiently large that our conclusion would not be changed even if we were to take into account petitioner's bright financial future at the close of each year, confirmed by a continuing high level of profits— a procedure which might well be open to question.[11] Cf. *Sterling Distributors, Inc.* v. *United States*, 313 F. 2d 803 (C.A. 5, 1963); see sec. 1.537–1(b)(2), Income Tax Regs.

The substantial deficits in availabilities make it unnecessary for us to consider other items for which petitioner claimed the necessity of retaining earnings and profits. We note in passing, however, the following:

(a) Although, by our method of determining availabilities herein, we have largely discounted petitioner's claimed need for funds to make short-term loans to employees, finance customers, and obtain purchase discounts, the fact is that petitioner needed modest, continuing cash reserves for these purposes.

---

[10] On the basis of the lower of the requirements according to our calculations and those of respondent.

[11] It is not clear whether the injunction against taking post-taxable-year events into account is limited to the determination of actual needs of a business without regard to availabilities to meet those needs or extends as well to the evaluation of such availabilities. See S. Rept. No. 1622, p. 69; H. Rept. No. 1337, p. 53.

(b) Throughout the years in question, petitioner was considering the acquisition of Hy-Way Block Co., which would have required an initial cash outlay of $75,000 plus an additional amount of $425,000 payable over an 8-year period with interest at 5 percent. The record is unclear whether this acquisition was considered by petitioner as being in addition to, or in substitution for, the expansion of its own facilities at Paramus, although the disparities in dates and in the potential amount involved possibly point in the former direction.

(c) As to the possibility that funds would be required to redeem petitioner's shares in the event of Albert's death, we recognize that the courts tend to look askance at such claimed need for the purposes of the accumulated earnings tax, particularly where, as is the case herein, there is no evidence that there were dissenting or competing shareholder factions which threatened the corporate health. *Kirlin Corporation*, 361 F. 2d 818 (C.A. 6, 1966), affirming per curiam a Memorandum Opinion of this Court; *Youngs Rubber Corporation* v. *Commissioner*, 331 F. 2d 12 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court; *Gazette Pub. Co.* v. *Self*, 103 F. Supp. 779 (E.D. Ark. 1952); *Dill Manufacturing Co.*, 39 B.T.A. 1023 (1939). Compare *Pelton Steel Casting Co.* v. *Commissioner*, 251 F. 2d 278 (C.A. 7, 1958), affirming 28 T.C. 153 (1957), with *Mountain State Steel Foundries, Inc.* v. *Commissioner*, 284 F. 2d 737 (C.A. 4, 1960), reversing a Memorandum Opinion of this Court. See generally, Maxfield, "Recent Cases Forecast More Liberal Trend in Allowing Accumulations to Redeem Stock," 25 J. Taxation 43 (1966); Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 230, 231 fn. 44 (2d ed. 1966); (1966 ed.); Herwitz, "Stock Redemptions and the Accumulated Earnings Tax," 74 Harv. L. Rev. 866 (1961). Moreover, the testimony herein reflects no more than the vaguest sort of estimates as the amounts involved. Similar considerations apply to the claimed need for keyman insurance on the lives of Albert and Gerhardt, which was in fact never procured and, in light of Albert's poor health, was unlikely ever to be procurable as far as he was concerned. *Emeloid Co.* v. *Commissioner*, 189 F. 2d 230 (C.A. 3, 1951), reversing 14 T.C. 1295 (1950).

While the record herein is not as neat and tidy as it might have been, we are left with the firm conviction that, during the taxable years involved herein, petitioner had proven business needs and that it had the requisite plans to meet those needs. Our conviction is reinforced by the critical fact that both the needs and the plans therefor were actually implemented to a very large degree.[12] Under these cir-

---

[12] We note also that petitioner's total expenditures for capital acquisition during the 10-year period, 1957–66, exceeded the aggregate amount of its net income after taxes during the same period.

cumstances, even if there are residual doubts, we would not be justified in substituting our business judgment for that of petitioner's officers and directors. We thus conclude that petitioner has fully sustained its burden that the accumulation of all its earnings and profits during 1961, 1962, and 1963 was required by the reasonable needs of its business.[13] Such being the case, we have no need, in light of the credit provided for in section 535(c)(1), to consider whether the proscribed purpose of avoiding income tax may have existed. *John P. Scripps Newspapers, supra* at 474.

*Decision will be entered for the petitioner.*

---

[13] Our conclusion obviously has no bearing on petitioner's possible vulnerability in subsequent years—a question which will have to be determined in light of the facts and circumstances as they exist in those years and with due regard to the fact that, to the extent which we have indicated herein, certain expenditures in those years have already been earmarked against accumulated earnings and profits as of the close of 1963.