C. E. ESTES, INCORPORATED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
C. E. Estes, Inc. v. Commissioner
Docket No. 8719-78.
United States Tax Court
T.C. Memo 1980-504; 1980 Tax Ct. Memo LEXIS 79; 41 T.C.M. (CCH) 354; T.C.M. (RIA) 80504; November 13, 1980, Filed Carl E. Davis and Joseph C. Wool, Jr., for the petitioner. Robert A. Johnson, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined deficiencies in petitioner's Federal income tax for its fiscal years ending October 31, 1974, and October 31, 1975, in the amounts of $4,026.05 and $9,204.26, respectively. The sole issue presented for decision is whether petitioner's accumulation of earnings for the years in issue was beyond the reasonable needs of its business and for the purpose of avoiding income tax liability of its sole shareholder pursuant to section 532(a). [1]
FINDINGS *81 OF FACT Some of the facts have been stipulated and are so found. Petitioner is a corporation whose principal offices were located in Richmond, Virginia, at the time the petition herein was filed. It filed its Federal corporate income tax returns for each fiscal year in issue with the Internal Revenue Service Center in Memphis, Tennessee. Petitioner was incorporated on November 5, 1956. Its purposes were, inter alia, to own, lease and operate motor trucks for the transportation of property as a contract carrier. Since its inception petitioner has been an intrastate carrier and its only major customer has been the Celanese Corporation of America (hereinafter Celanese), a manufacturer of yarn and textiles. Petitioner has also been a lessor of motor freight equipment to other common carriers. Throughout its existence Charles E. Estes (hereinafter Estes) has been the president of petitioner and he has owned 100 percent of its stock. During the years in issue Estes received a salary of $12,000. Estes is also the sole owner of Great Coastal Express, Inc., an interstate carrier, and C. E. Estes Contract Carrier, an intrastate carrier operated as a sole proprietorship. Any distribution *82 by petitioner to Estes as dividends for the years in issue would have been taxable to him at a 60 to 70-percent tax rate. Petitioner was initially capitalized with $1,000 in 1956. In its early years it leased tractors and purchased used trailers. Its net assets for fiscal years ending October 31, 1974 and 1975, as reported on its Schedule L forms, were $292,684.88 and $333,540.69, respectively. During the years in issue petitioner owned 60 trailers and 2 tractors. At no time was the petitioner required to borrow any funds for its expansion. All of petitioner's growth had been funded through its retained earnings. No dividends had ever been paid to Estes by petitioner. Slumps in the textile industry affected the business of Celanese and hence the volume of hauling done by the petitioner. These peaks and valleys caused the petitioner to experience operating results of approximately a $1,500 profit in fiscal 1971, a $4,000 profit in fiscal 1972, and an $8,000 loss in fiscal 1973. Partly for this reason petitioner sought to expand its business. Celanese had promised petitioner much more of its business if the petitioner could obtain ICC operating authority into North Carolina *83 through lease or purchase. In 1961 the petitioner began to seek such authority. Petitioner engaged actively in inquiries, negotiations and bidding for several years. Finally, in 1966 petitioner did acquire the authority by lease and it hauled the Celanese business into North Carolina in 1966 and 1967. Petitioner's lease, however, was terminated on the death of the lessor in 1967. From that time, at least through March 1978, petitioner had continually sought the acquisition of operating rights. This action was authorized by resolution of petitioner's board of directors at a meeting in March of 1973. In 1976 petitioner bid $3.2 million for operating rights into North Carolina, South Carolina and Georgia. It was outbid by another firm with the high bid of $5.6 million. Petitioner has consistently been outbid in its attempts to purchase such rights. Petitioner also decided to enter the leasing business. Pursuant to a resolution of its board of directors in March 1973, petitioner purchased 20 new stock trailers in 1973 at a cost of $99,940, which it leased to C. E. Estes Contract Carrier for $150 per month per trailer. Estes attributed the petitioner's profits of approximately *84 $20,000 in fiscal 1974 to this additional leasing operation. At the time of this purchase, in addition to trailers used mostly for storage, petitioner owned 10 trailers which it had acquired in 1968 and 15 which it had acquired in 1969, used to haul Celanese products. On October 31, 1974, Estes estimated that at least 20 of these would have to be replaced within the next two or three years since their useful life is only six to eight years. The cost of trailers in 1974 was between $5,000 and $8,000 and in 1975 it was between $7,000 and $10,000, depending on whether they were stock (40-foot) or custom (45-foot) trailers. In 1977, prior to the IRS audit which is the basis for this litigation, petitioner purchased 20 new custom trailers for a total of $200,200. In 1979 the petitioner purchased another 10 custom trailers for a total of approximately $130,000. Estes also estimated that petitioner's two tractors purchased in 1970 would have to be replaced between 1976 and 1978. In 1974 tractors of the type petitioner used were selling for $25,000, and in 1975 the price had risen to $34,000. In 1978 petitioner ordered two new tractors at a total cost of $96,000 ($48,000 each). *85 Petitioner's earnings and profits during the years in issue were as follows: [2]
Accumulated
Current Earnings
Date
Earnings & Profits
& Profits
10/31/74
$275,602.61
$14,640.19
[$260,962.42 and 14,640.19]
10/31/75
$325,154.92
33,470.04
[$291,684.88 and 33,470.04]
On October 31, 1974, and October 31, 1975, the petitioner's net liquid assets after a reduction for the business's working capital needs and income taxes payable were, for fiscal 1974, $181,127, and for fiscal 1975, $217,868. [3]
On February 6, 1978, petitioner was notified by certified mail of *86 the Internal Revenue Service's intention to assert the accumulated earnings tax imposed by section 531. On March 28, 1978, petitioner submitted a statement in response thereto pursuant to section 534(c). The grounds stated for the accumulation were (1) ordinary working capital requirements (which respondent agrees were reasonable in amount), (2) anticipated purchases of trailers and tractors at a cost of over $250,000, and (3) the acquisition of additional operating rights. The statement of facts accompanying these grounds for the most part summarized the facts as we have found them. Respondent argues that petitioner's statement prepared pursuant to section 534(c) does not state facts sufficient to show the basis for the accumulation of earnings, and that consequently the burden of proving that the accumulation was not beyond the reasonable needs of the business lies with the petitioner. Respondent has determined that petitioner's accumulations of earnings for its fiscal years 1974 and 1975 were in excess of its reasonable business needs and were for the purpose of avoiding Estes' income tax liability making it liable for the penalty tax provided by section 531. OPINION *87 The accumulated earnings tax is imposed on a corporation if it is found to have been formed or availed of for the purpose of avoiding tax liability to its shareholders through accumulation rather than distribution of its earnings and profits. Sec. 532. The statute is designed to motivate a corporation to distribute those profits which it has retained that are not needed for the operation of its business. United States v. Donruss Co.,393 U.S. 297, 303 (1969). However, since the tax is a penalty, it should be narrowly construed. See Ivan Allen Co. v. United States,422 U.S. 617, 627 (1975); Commissioner v. Acker,361 U.S. 87, 91 (1959). Whether a corporation has accumulated earnings beyond the reasonable needs of its business is a question of fact to be determined with reference to all of the facts and circumstances of the particular business. See Helvering v. National Grocery Co., 304 U.S. 282 (1938); Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d 495 (4th Cir. 1960); Doug-Long, Inc. v. Commissioner,72 T.C. 158 (1979); Faber Cement Block Co. v. Commissioner,50 T.C. 317 (1968). *88 It is not the size of the accumulation, but rather whether it exceeds the reasonable needs of the business which is determinative. See Smoot Sand & Gravel Corp. v. Commissioner,supra; Faber Cement Block Co. v. Commissioner,supra.Further, we will not substitute our business judgment for that of the petitioner's management unless the facts and circumstances presented compel us to do so. Magic Mart, Inc. v. Commissioner,51 T.C. 775 (1969); Faber Cement Block Co. v. Commissioner,supra.To the extent that earnings and profits are required to meet the corporation's reasonable needs, it is entitled to a credit against accumulated taxable income. Sec. 535. This applies equally to reasonably anticipated needs. Secs. 537, 1.537-1(b), Income Tax Regs.; Bahan Textile Machinery Co. v. Commissioner,453 F. 2d 1100 (4th Cir. 1972). A specific, definite and feasible plan must exist to prove reasonably anticipated needs. Sec. 1.537-1(b), Income Tax Regs. In a closely held business such a plan may be informal; however, it must be shown by some contemporary course of conduct evidencing the asserted purpose. *89 Smoot Sand & Gravel Corp. v. Commissioner,241 F. 2d 197 (4th Cir. 1957); Doug-Long, Inc. v. Commissioner,72 T.C. 158 (1979). Accumulations beyond the reasonable needs of the business are "determinative of the purpose" to avoid tax to shareholders. Sec. 533(a). As such we deal with state of mind of the corporation's management. See Ivan Allen Co. v. United States,422 U.S. 617 (1975); Bahan Textile Machinery Co. v. Commissioner,453 F. 2d 1100 (4th Cir. 1972). We will look to the nature of the business as well as its conduct during the years in issue to deduce its purposes for the accumulation. The nature of its accumulations will also reflect whether or not accumulation is reasonable. The issue is not how much capital of all types has been retained but how much of it is in the nature of liquid assets, and to what extent it was reasonable to accumulate assets in this form. Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975); Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d at 501. The Fourth Circuit in Smoot Sand & Gravel Corp. v. Commissioner,274 F. 2d at 501, *90 stated: to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. * * * Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonably foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the shareholders. * * * In the instant litigation petitioner proffered two grounds for the accumulation of $181,127 and $217,868 in net liquid assets [4] in fiscal years 1974 and 1975, respectively. These were: (1) the cost of at least 20 new custom trailers for leasing and hauling and the cost of 2 new tractors to replace those used to haul Celanese products; and (2) the cost to acquire interstate operating rights sough of Virginia. *91 In 1974 the cost of a custom trailer was $8,000. Through his experiences in the trucking industry Estes knew in 1974 that at least 20 of the trailers purchased in 1968 and 1969 would have to be replaced within the next few years at a cost of at least $160,000. It was also his experience that at about the same time two tractors would need replacement at a cost of at least $50,000. Thus, during fiscal 1974, petitioner was aware that within two to three years a cash outlay of at least $210,000 would be required. By 1975 custom trailer costs had risen to $10,000 per unit and tractors had increased to a price of $34,000 each. As a result, in fiscal 1975 petitioner revised its estimated cost to replace these items up to $268,000. Petitioner's plans to acquire this equipment were not vague or uncertain. They were believed to be necessary if petitioner was to remain in the business of hauling Celanese products and for the expansion of leasing operations. Estes' statements of petitioner's plans to purchase tractors and trailers are of particularly great weight since petitioner actually did expend $200,200 on new trailers in 1977, $96,000 on new tractors ordered in 1978, and $130,000 *92 on more trailers in 1979. Our concern is whether petitioner was motivated by a tax avoidance purpose in 1974 and 1975. Events subsequent to those years, however, are highly probative of actual plans designed for later implementation. Faber Cement Block, Co. v. Commissioner,50 T.C. 317 (1968). Petitioner had been experiencing peaks and valleys as they were experienced by Celanese. With low profits in fiscal years 1971 and 1972, followed by a substantial loss in fiscal 1973, petitioner had good reason to be uncertain that it would be able to fund its equipment needs out of future profits without borrowing to do so. Retention of past earnings was essential. Respondent suggests several reasons why we should not accept these replacements as a reasonable basis for accumulation. First, respondent indicates that since petitioner was willing and able to borrow to fund its acquisition of operating rights it could similarly fund the new equipment.Although this is true, it is equally true that neither the statute nor the regulations require financing operations or expansion by borrowing as opposed to using retained profits. In fact, reasonableness of accumulations should *93 be judged without regard to the borrowing capabilities of the petitioner. See Myron's Enterprises v. Commissioner,548 F. 2d 331, 335 n. 6 (9th Cir. 1977); General Smelting Co. v. Commissioner,4 T.C. 313 (1944). Respondent concedes that equipment must be replaced in an ongoing business, but maintains that petitioner has never replaced any of its old fully depreciated trailers. Respondent argues that this results in deflated liquid assets since petitioner carries these on its books at salvage value, which would be translated into cash--a liquid asset--if sold. We find this argument devoid of merit on the facts of this case. New trailers were purchased by petitioner in 1977 and 1979 as replacement trailers. It is not crucial that they were used in petitioner's leasing business rather than to haul Celanese products. The older, fully depreciated trailers could not have been used for either prupose. They were used for storage in the petitioner's yard and for very short hauling jobs. They perform a necessary function for petitioner which renders their sale out of the question. Respondent also argues that petitioner's reserve for depreciation *94 should be reduced by accumulated depreciation attributable to these fully depreciated trailers. Respondent apparently suggests that the reserve for depreciation is the only amount which is needed for replacement of trailers. Although in theory it may be true that, with respect to fully depreciated assets, accumulated depreciation plus salvage value would equal replacement cost, that analysis assumes no inflation. Furthermore, as a principle of standard accounting practices, when a fully depreciated asset is continued in use it should be kept on the books as petitioner has done. Moreover, for our purposes reserve for depreciation is merely a book entry and basically irrelevant in determining petitioner's reasonably foreseeable expenditures for trailer replacement. Finally, respondent argues that petitioner's acquisition of 10 custom trailers in 1979 was merely for the purpose of using up its accumulated earnings.He argues that, since the 20 custom trailers purchased in 1977 were used in petitioner's leasing operations where stock trailers would have sufficed, the additional cost of custom trailers in 1979 was an unnecessary additional expense. We disagree. Petitioner's stated *95 needs for additional and replacement trailers were for Celanese hauling and to expand its leasing operations. Celanese hauling required custom trailers. Petitioner had experienced peaks and valleys in its Celanese business and did not know when trailers would be needed to haul its products. Furthermore, throughout this period petitioner was continually seeking to expand its operating authority which would have caused a major upsurge in Celanese business. Until that authority was acquired, however, petitioner has put its resources into expansion of leasing operations. It is only reasonable that petitioner remain prepared to shift its resources between the two operations. The only way to do that was to build its trailer fleet with only custom trailers. Based on the foregoing discussion, we hold that it was reasonable for petitioner to accumulate earnings for fiscal 1974 in the amount of $210,000, and for 1975 in the amount of $268,000 for equipment needs. Since these amounts exceed petitioner's net liquid assets for those years of $181,127 and $217,868, respectively, petitioner is not liable for the accumulated earnings tax imposed by section 531. In light of the above we *96 find it unnecessary to rule on the sufficiency of petitioner's section 534(c) statement to shift the burden of proof to the respondent for the facts of record herein establish that petitioner's accumulations of earnings and profits were not beyond the reasonable needs of the business. Decision will be entered for the petitioner. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. These accumulated earnings and profits figures are based on those found in respondent's deficiency notice sent to petitioner. Petitioner has not objected to the use of these figures, consequently we shall proceed on the basis that they are correct.↩
3. Petitioner retained $13,600 in fiscal 1974 and $22,000 in fiscal 1975 as working capital to meet its ordinary operating costs and expenses. It also retained $6,606.37 in fiscal 1974, and $14,238.14 in fiscal 1975, for income taxes payable for those years. The parties have stipulated to the reasonableness of these figures.↩
4. Respondent argues that net liquid assets should include the cash surrender value of "key man" life insurance on the life of Estes. We disagree. Generally acceptable accounting principles dictate the exclusion of cash surrender value of life insurance from current assets. AICPA Accounting Research and Terminology Bulletins, Accounting Research Bulletin No. 43, "Restatement and Revision of Accounting Research Bulletins," ch. 3, sec. A, par. 6(d), p. 21 (1961). This principle is in harmony with recent case law. See Suwannee Lumber Manufacturing Co. v. Commissioner,T.C. Memo. 1979-477, wherein we stated-- the cash surrender value of the life insurance policies was not reasonably available for Suwannee's current operating needs and should not be considered a current asset. Life insurance policies having cash values represent to more than an asset which could serve as collateral for borrowing. Any such borrowing, although it would produce liquid cash, would technically be offset by a corresponding current liability. [Fn. ref. omitted.]↩