ATLANTIC COMMERCE & SHIPPING CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Atlantic Commerce & Shipping Co. v. Commissioner
Docket No. 5272-70
United States Tax Court
T.C. Memo 1973-106; 1973 Tax Ct. Memo LEXIS 180; 32 T.C.M. (CCH) 473; T.C.M. (RIA) 73106; May 7, 1973, Filed Arthur L. Harrow, for the petitioner. Michael K. Phalin, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION
FORRESTER, Judge: Respondent has determined deficiencies in petitioner's income tax for the taxable years 1965 and 1966 in the respective amounts of $21,057.98 and $18,360.63. The only issue before us is whether petitioner is liable for the accumulated earnings tax imposed by section 531. [1]
*182 2 FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition herein was filed petitioner's principal place of business was located in New York, New York. Petitioner filed its Federal income tax returns for the taxable years 1965 and 1966 with the district director of internal revenue for the Manhattan district in New York, New York. Petitioner, Atlantic Commerce & Shipping Co., Inc., was incorporated under the laws of Nevada in 1941. It has been controlled since its formation by George S. Pathy (George). On December 31, 1965, George owned 98.75 percent of petitioner's stock and was its president. At that time George's brother, Ladislas Pathy (Ladislas), owned the remaining 1.25 percent of its stock. The Pathy family has been involved in the international shipping business for nearly 50 years. Their substantial investments in the Hungarian Merchant Marine were confiscated at the outset of World War II. Later, they suffered significant losses when the Merchant Marine of the United Arab Republic was nationalized in 1957. Since 1957 they have invested heavily in the Canadian and American shipping industries. 3 In addition *183 to petitioner the Pathy family controls several other corporations which are also engaged in shipping and related activities. During the years in issue George held an interest in 18 or 19 foreign and domestic Pathy family corporations. Petitioner also held an interest in most of the same family corporations. Large investments were often split up among the various family corporations, all of which were controlled by a group comprised of members of the Pathy family and other family corporations. Among the corporations which the Pathy family controlled prior to and during the years in issue were Pathy Shipping, Inc. (Pathy Shipping), Federal Commerce and Navigation Co., Ltd. (Fed. Nav.), Federal Marine Terminals, Inc. (Federal Marine), and Federal Bulk Carriers, Inc. (Federal Bulk). Pathy Shipping was incorporated under the laws of New York in 1953, and has always been under the control of Ladislas. At the close of 1966 Ladislas, together with his wife and childred, owned 4,608 shares of stock in Pathy Shipping. George owned the remaining 36 shares. During the period in issue Pathy Shipping carried on business activities comparable to petitioner's, and both corporations shared *184 the same offices. 4 Fed. Nav. is a large Canadian corporation engaged in international shipping on vessels which it either owns or time-charters. In 1964 the Pathy family gained complete control of Fed. Nav. when Pathy Shipping bought out the interest of an unrelated corporation which was dissatisfied with Fed. Nav.'s recent earnings performance. Pursuant to an agreement which Ladislas and George reached at the time of this purchase, petitioner in 1965 acquired from Pathy Shipping 9, 347 shares in Fed. Nav. On December 31, 1965, the stock of Fed. Nav. was held as follows: Party
Number of Shares
Petitioner
9,347
Pathy Shipping
28,153
George
17,500
Ladislas
17,500
Others
47,500
TOTAL
120,000
In 1966 petitioner purchased an additional 3,005 shares in Fed. Nav. from Pathy Shipping. By the close of 1966 Fed. Nav.'s business had improved and it had accumulated a very substantial amount of earnings. At the time of trial George was president of Fed. Nav. and had been for a number of years. In 1965 the shipping activities of Fed. Nav. had expanded to the point where it needed its own shipping terminal in 5 Chicago, Illinois. Fed. Nav.'s ships *185 were being faced with costly delays in loading and unloading cargoes because existing commercial terminals were often too busy to service its ships promptly. Fed. Nav. was facing a similar problem in Detroit, Michigan. Federal Marine is a domestic corporation which was incorporated in April 1965 for the purpose of acquiring marine terminals in Chicago and Detroit and operating them for the exclusive use of Fed. Nav. During 1965 and 1966 the stock of Federal Marine was held as follows: Name
Shares
Capital
Petitioner
5,000
$25,000
Pathy Shipping
5,000
25,000
Ladislas, Jr.
1,500
7,500
Federal Bulk
4,000
20,000
Other Interests
5,000
25,000
TOTALS
20,500
$102,500
Federal Marine acquired a terminal in Chicago in 1965, and a terminal in Detroit a year or two later. Federal Bulk was incorporated under the laws of New York in 1955. Petitioner invested $51,275 in Federal Bulk upon its formation and received in exchange 500 of its 10,000 shares of preferred stock at $100 per share, and 1,275 of its 30,000 shares of common stock at one dollar per share. The Pathy family has maintained complete control of Federal Bulk through the combined holdings *186 of family members and family corporations. Federal Bulk was formed for the purpose of buying and operating an ocean-going vessel, and in 1956 it purchased an American flagship named the S.S. Federal Jurist. It operated the vessel for a period and resold it at a large gain. It then acquired a 60 percent interest in a Canadian corporation which had been formed to build a giant oil tanker which was subsequently completed in 1959. This venture proved unprofitable 6 and was liquidated by Federal Bulk in 1965. In April 1965 Federal Bulk acquired a 19.75 percent interest in Federal Marine. Petitioner sold its interest in Federal Bulk to Ladislas in May 1967. Throughout 1965 and 1966, petitioner also held substantial interests in two foreign enterprises which were controlled by Alexander Pathy, another brother of George. These consisted of a $40,821.25 investment in Societe Industrille Commerciale Lyonnaise, and a $4,990.46 investment in Febrica Accessori Imbottigliamento Bezande, S.A. The business activity of these two companies was unrelated to petitioner's business. One of petitioner's witnesses, a certified public accountant who has been in charge of auditing its books *187 since the early 1950's, had prepared a comparative balance sheet for the years 1964 and 1965 which classified petitioner's holdings in these two companies as current assets and included them in a computation of working capital. Since its incorporation petitioner's activities have centered around various aspects of the shipping business. In the early years of its existence petitioner was principally active in the ownership of ocean-going shipping vessels. Later it had changed its mode of operation and chartered vessels rather than owning them. 7 The years 1960, 1961, and 1962 were very poor for the shipping industry. Excess tonnage and low shipping rates caused petitioner to suffer substantial operating losses during each of these three years. By the end of 1962 petitioner had concluded that its chartering business was too vulnerable to recurring losses brought about by downswings in the cyclical economy of the shipping industry. It therefore made a final decision in 1962 to terminate its direct participation in the chartering of shipping vessels. It decided instead to furnish brokerage and management services to other shippers. Petitioner's transformation from a chartering *188 business to a brokerage operation was largely effected by the close of 1962, and was virtually completed by the close of 1963. At the time petitioner decided to change the nature of its business from chartering to brokerage it also entered into an arrangement to provide brokerage services for Fed. Nav. During the years 1965 and 1966 substantially all of petitioner's operating income was derived from the brokerage commissions which it received from Fed. Nav. for soliciting and placing dry cargoes on that corporation's ocean-going vessels. During 1965 petitioner earned commissions totaling $264,288; of this amount $254,395 was received for placing cargoes on ships either owned or chartered by Fed. Nav. In 1966 petitioner received from Fed. Nav. $290.924.67 out of its total commission income of $29l.621.59. Pathy Shipping also performed brokerage services for Fed. Nav. during the years in issue, and it also derived substantially all of its operating income from commissions which it received for placing cargoes on ships owned or chartered by Fed. Nav.
In April 1957 George contributed $24,166.52 to petitioner as paid-in capital surplus. This brought the total of petitioner's *189 capital stock plus capital surplus to $224.166.52, a level which it maintained until January 1966. On October 6, 1965, petitioner's board of directors voted to declare a nontaxable stock dividend of $200,000 payable in January 1966. Incident to this stock dividend petitioner transferred $200,000 from earned surplus to capital stock in January 1966. Prior to 1963 petitioner had needed a capital base in excess of $200,000 in order to properly conduct its charter business. However, its capital needs were much smaller after it shifted to a purely brokerage business. Its brokerage operations generated very low operating costs in comparison to its chartering activities, and virtually eliminated any prospect 9 of the sort of operating losses which it had suffered during 1960, 1961, and 1962. Petitioner decided in 1962 not to distribute its capital in excess of what it needed to carry on its brokerage business. It decided instead to retain such excess and invest it in real estate. Petitioner was not interested in commencing the active conduct of a real estate business, but rather was primarily looking for isolated passive investments which would supplement its commission income. *190 Beginning in 1962 and continuing well beyond the years in question, petitioner sought real estate investment opportunities for its excess funds. In addition to consulting its bank and its lawyers about prospective investments, petitioner also retained a Canadian real estate firm located in Toronto, Ontario, and an investment broker in New York, New York. Each of these brokers was reimbursed for the costs and expenses incurred in drawing up investment proposals. During the period from late 1962 until the close of 1966, petitioner examined at least 30 or 40 real estate investment proposals presented by its agents. These proposals included a hospital, shopping centers, farm land, industrial sales and leasebacks, apartment buildings, medical buildings, a post office, and office buildings. The location of these investment 10 opportunities ranged from Toronto, Ontario, Montreal, Quebec, and Vancouver, British Columbia, in Canada, to Little Rock, Arkansas, Franklin Park, Illinois, Miami, Florida, Los Angeles, California, and New York, New York, in the United States. The cost of the prospective investments often exceeded $200,000. All of these investments were passive in nature, *191 and none of them was related to petitioner's existing brokerage business. In Ocotber 1967, petitioner and Federal Bulk jointly acquired a factory building in Brooklyn, New York. Petitioner agreed to furnish one-half of the total purchase price of $391,106.08, and obtained mortgage loan funds to satisfy all but $17,000 of its share. The mortgage loan called for monthly payments of principal and interest in the amount of $4,778.33 until January 1, 1972, at which time the outstanding balance became due and payable. Despite its search for investment opportunities, at the time of trial petitioner had made no investments under its real estate diversification plan other than its purchase of the factory building in Brooklyn. Petitioner was still looking for real estate investments in 1972. At the time Federal Marine was incorporated in April 1965, its shareholders anticipated that it would need to make future acquisitions of equipment in order to operate its terminal 11 facilities efficiently. In 1965 petitioner and the other shareholders entered into an informal agreement in which they agreed to aid Federal Marine in financing such acquisitions. In 1966 Federal Bulk had *192 acquired two cranes at a total cost of $263,800 and leased them to Federal Marine for use in loading and unloading vessels at its Detroit terminal. In 1968 Federal Marine approached petitioner and requested assistance in financing the purchase of a crane. Subsequently, in August 1968, petitioner purchased a Vicon crawler crane at a cost of $172,990.27 and leased it to Federal Marine for use at its Chicago terminal. At the time of trial in 1972 petitioner was negotiating the purchase of two additional pieces of equipment at a total cost exceeding $300,000. Both machines were to be leased to Federal Marine for use at its Chicago terminal. The period beginning in 1963 and continuing through 1970 was relatively prosperous for the shipping industry. During this period petitioner's brokerage business was quite profitable. Petitioner's balance sheets at the close of its taxable years 1965 and 1966 reveal the following information: 12 December 31, 1965
December 31, 1966
Cash
$127,046.89
$ 27,526.29
Accts. & Notes Receivable
79,773.58
214,627.03
U.S. Gov't Obligations
-0-
10,000.00
Listed Marketable Securities
227,162.90
200,389.30
Total Current Assets
$433,983.37
$452,542.62
Investments in Related Corporations in Federal Bulk
51.275.00
51,275.00
Fed. Nav.
53,158.43
71,277.87
Fed. Marine
25,000.00
25,000.00
Investments in Other Family Corporations Societe Industrille Commerciale Lyonnaise
40,821.25
40,821.25
Febrica Accessori Imbottigliamento Bezande, S.A.
4,990.46
4,990.46
Other Assets
2,749.09
15,711.11
Total Assets
$611,977.60
$661,618.31
Current Liabilities
$131,567.96
$97,246.01
Capital Stock
200,000.00
400,000.00
Paid-in Capital surplus
24,166.52
24,166.52
Earned Surplus
256,243.12
140,205.78
Total Liabilities and Capitol
$611,977.60
661,618.31
Working Capitol
$302,415.41
355,296.61
*193 13 Petitioner's Federal income tax returns for the years 1960 to 1970 show the following addtional information: After-Tax Income
Earned Surplus 12/31
1960
*-0-
$87,114.19
1961.H*-0-
8,797.93
1962
* -0-
29,576.65
1963
66,643.35
104,995.05
1964
81.224.64
183,595.71
1965
73,578.39
256,243,12 1966
81,008.81 **140,205.78
1967
69.950.32
162,899.67
1968
156,773.62
261,389.55
1969
57,732.82
300,157.00
1970
105,840.24
355,426.42 14 Petitioner's operating expenses totaled $162,060.48 in 1965 and $144,862.20 in 1966. The principal elements comprising its operating expenses were salaries and rent. Its working capital on December 31, 1964, was $307,214.18, nearly all of which was represented by case and marketable securities. Petitioner's brokerage business did not require the maintenance of inventories. For the purposes of section 535 petitioner's accumulated taxable income for the years 1965 and 1966 was $76,574.47 *194 and $66,765.93, respectively. If at the ends of the taxable years 1965 and 1966 it had distributed its total earnings and profits to its shareholders, George would have been liable for additional income tax in the amounts of $41,404.75 and $39,635.95, respectively. Petitioner's entire case dividend history is as follows: Amount of Dividend
Date Declared
Date Paid
$20,000
January 31, 1967
March 14, 1967
28,000
December 31, 1967
March 13, 1968
48,000
December 31, 1968
March 14, 1969
24,000
December 23, 1969
March 13, 1970
50,000
December 22, 1970
March 12, 1971
Petitioner had no loans outstanding to its shareholders during the period from 1960 through 1970. 15 In accordance with the provisions of section 534(b), respondent sent to petitioner by certified mail on October 1, 1969, a notification that a proposed notice of deficiency included the imposition of an accumulated earnings tax under section 531, for the taxable years 1965 and 1966. Pursuant to section 534(c), petitioner timely submitted to respondent on December l, 1969, a statemtnt of the grounds on which it relied to establish that it had not permitted its earnings and profits *195 to accumulate beyond the reasonable needs of its business. Respondent mailed to petitioner a notice of deficiency dated May 15, 1970. OPINION
Section 531 imposes an additional tax on every corporation which is formed or availed of for the purpose of avoiding an income tax on its shareholders by accumulating rather than distributing its earnings and profits. The issue for our decision is whether petitioner was availed of for this improper purpose during 1965 and 1966. This issue is one of fact. Helvering v. Nat. Grocery Co, 304 U.S. 282 (1938). In order to at least partially avoid the inherent difficulties involved in a subjective evaluation of a corporation's 16 motive for accumulating its earnings, section 533(a)[2] provides an objective means of establishing a rebuttable presumption of the tax avoidance purpose. Cf. United States v. Donruss Co., 393, U.S. 297, 307, (1969). The presumption arises if the corporation's earnings and profits are permitted to accumulate beyond its reasonable business needs. Section 537 defines "reasonable needs of the business" to *196 include reasonably anticipated needs of the business. The determination of whether a corporation has accumulated its earnings beyond its reasonable business needs is a very significant, and usually crucial, step in deciding whether it was availed of for the tax-avoidance purpose. See United States v. Donruss, supra at at 307; Faber Cement Block Co., 50 T.C. 317, 327 (1968). The size and nature of a corporation's accumulations at the outset of the years in issue can be a very important factor in this determination. Smott Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495 (C.A. 4, 1960), affirming a Memorandum *197 Opinion of this Court, certiorari denied 362 U.S. 976 (1960). In the instant case 17 petitioner's earned surplus account showed beginning balances of $183,595.71 in 1965, and $256,243.12 in 1966. Its working capital, of which more than "$200,000 was invested in listed marketable securities and government obligations, slightly exceeded $300,000 at the beginning of both years. In addition, throughout both 1965 and 1966 petitioner maintained long-standing investments totaling $45,811.71 in two foreign corporations which conducted businesses unrelated to its own. These corporations were controlled by Alexander, a brother of petitioner's principal shareholder, George. Although these investments were not included in the parties' stipulated computation of current assets, they were in no way related or necessary to the conduct of petitioner's business and were entitled to some consideration by petitioner in planning for its future business needs. That they had some measure of liquidity is attested to by the fact that petitioner's own accountant included them in a computation of current assets for 1964 and 1965. We conclude that petitioner had between $300,000 and *198 $350,000 in liquid assets available to meet its business needs at the beginning of both 1965 and 1966. If these prior accumulations were sufficient to meet its reasonably anticipated business needs, then its further accumulations of 1965 and 1966 earnings were unreasonable and give rise to the presumptions of tax avoidance purpose. We turn now to an analysis of petitioner's alleged business needs. 18 Although the burden of proof in tax cases is ordinarily on the taxpayer, section 534[3] prescribes that, under certain 19 circumstances and to a limited extent, the burden of proof as to accumulation "beyond the reasonable needs of the business" can be shifted to respondent. Compliance with section 534 will shift such burden, but only with respect to the grounds set forth by taxpayer in its 534(c) statement. The overall burden of proof as to the proscribed purpose of avoiding income tax on its shareholders remains on petitioner. However, given the importance of business needs as a justification for accumulating earnings, this limited shift in the burden of proof can be quite significant. *199 *200 Respondent duly sent to petitioner a notification in accordance with section 534(b), and petitioner timely filed a statement under section 534(c) setting forth the purported business needs which it claims were sufficient grounds to justify the accumulation of 1965 and 1966 earnings. Respondent has made no claim that the "basis" facts alleged in support of the stated "grounds" in petitioner's 534(c) statement were false, or that the statement is a mere sham. Instead, he argues that petitioner's statement was not effective to shift the burden of proof because none of the grounds listed therein is sufficient to justify an accumulation of earnings. We will address ourselves to each of the grounds set forth in petitioner's 534(c) statement in turn, resolving them on the merits as well as determining who has the burden of proof. 20 1. Diversification Plans Petitioner suffered heavy losses totaling approximately $100,000 during the three years of 1960, 1961, and 1962. Because of these losses, both petitioner and Pathy Shipping (controlled by Ladislas, George's brother) terminated their chartering operations and by the close of 1963 had entirely shifted their businesses into the *201 field of providing brokerage and management services for other shipping firms. The Pathy family's extensive experience in the shipping industry was admirably suited for such activities, and petitioner and Pathy Shipping enjoyed an immediate prosperity which began in 1963 and continued well beyond the years in issue. In 1964 petitioner and Pathy Shipping gained complete control of Fed. Nav., one of the largest shipping firms in Canada. During 1965 and 1966 both petitioner and Pathy Shipping received nearly all of their respective brokerage commission incomes from Fed. Nav.
Petitioner's brokerage operations required much less capital than had its chartering operations. In 1962 George decided that petitioner should retain its excess capital and use it to diversify, rather than distributing it. George apparently also decided that it should accumulate its current 21 earnings for use in diversification. In both 1965 and 1966 petitioner accumulated all of its after-tax income of $73,578.39 and $81,008.81, respectively. [4]
Petitioner *202 claimed in its 534(c) statement, and later on brief, that its diversification plans or "ground" included two elements, both of which were allegedly reasonable grounds for its accumulation of 1965 and 1966 earnings. For purposes of section 534 we will treat these two elements as separate and distinct grounds. Petitioner's first diversification ground is based on George's intention formed in 1962 to diversify by purchasing substantial real estate investments. The theoretical and factual bases of this ground were fully disclosed in petitioner's 534(c) statement, and the ground is not clearly untenable. Consequently, respondent's arguments that the purported real estate diversification plans were inadequate to support an accumulation of earnings are more appropriately addressed to a discussion of the issue on the merits, rather than to the preliminary burden-of-proof issue. To allow respondent to so easily thwart petitioner's bona fide attempt 22 to comply with the statute would undermine and frustrate the legislative purpose for enacting section 534. Cf. H. Rept. No. 1337, 83d Cong., 2d Sess., 52 (1954). We therefore hold that the burden of proof with respect to this ground *203 has shifted to respondent. Cf. Chatham Corp., 48 T.C. 145 (1967); Electric Regulator Corporation, 40 T.C. 757, 764 (1963), reversed on another issue 336 F. 2d 339 (C.A. 2, 1964). Notwithstanding the shift in the burden of proof, we are convinced, as our analysis below will indicate, that petitioner's real estate diversification plans did not warrant an accumulation of its 1965 and 1966 earnings. If petitioner's plans were to enter the real estate field in order to strike up a second active trade or business in addition to its existing brokerage business, or to acquire real estate for a use related to its brokerage operations, then such plans would have been a legitimate ground for the accumulation of earnings. See Sandy Estate Co., 43 43 T.C. 361, 375-377 (1964); cf. sec. 1.537-3(a), Income Tax Regs. However, if petitioner was only interested in real estate as a source of passive investments unrelated to its brokerage business, then its plans did not constitute a legitimate ground for accumulation. See section 1.537-2(c)(4), Income Tax Regs.; 23 Kerr-Cochran, Inc. v. Commissioner, 253 F. 2d 121 *204 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court; J. M. Perry & Co. v. Commissioner, 120 F. 2d 123 (C.A. 9, 1941), affirming a Memorandum Opinion of this Court; J. Gordon Turnbull, Inc., 41 T.C. 358, 377 (1963), affd. 373 F. 2d 87 (C.A. 5, 1967), Raymond I. Smith, Inc., 33 T.C. 141, 153-155 (1959), affd. 292 F. 2d 470 (C.A. 9, 1961), certiorari denied 368 U.S. 948 (1961); Kerr-Cochran, Inc., 30 T.C. 69, 80-82 (1958); Jacob Sincoff, Inc., 20 T.C. 288 (1953), affd. 209 F.2d 569 (C.A. 2, 1953); Whitney Chain & Mfg. Co., 3 T.C. 1109 (1944), affd. 149 F. 2d 936 (C.A. 2, 1945).[5]
Nowhere in the record is there a firm indication that petitioner seriously intended to enter into the active conduct of a real estate business. On the contrary, it shows affirmatively that petitioner was interested in real estate ventures solely as a source of passive investment income. Moreover, there is no evidence that petitioner was equipped to actually *205 operate the hospitals, post office, farms and office buildings it was investigating. Investments in the type of real estate petitioner was considering would be not unlike other types of passive investments such as cattle feeding 24 syndicates, oil and gas drilling ventures, government obligations, or marketable securities. It is also clear that petitioner was no more than marginally interested in acquiring real estate which would have been related to its brokerage business. Of the more than 50 items of correspondence introduced as evidence on the issue of petitioner's diversification plans, only one letter indicates any interest by petitioner in a related real estate investment. In a letter dated October 14, 1966, to his Canadian real estate broker, George expressed, inter alla, an interest in acquiring real estate in Toronto, Ontario, suitable for use as either a warehouse or a terminal site. Such an investment would have been related to petitioner's business because of its combined interests in Federal Marine and Fed. Nav. Cf. section 1.537-3(b), Income Tax Regs.
The October 1966 letter standing alone [6] is not even meager evidence that petitioner *206 had any sort of definite plans with 25 respect to investing in real estate related to its business. No other item of correspondence in the record even mentions a related real estate investment, and none of the real estate opportunities actually discussed or described in the correspondence had any relation to petitioner's business. The above facts, together with the record as a whole, convince us that George and petitioner were interested in real estate solely as a source of passive investments unrelated to petitioner's business. Therefore, petitioner's desire to locate an appealing real estate investment was not a reasonable business need, and did not afford a legitimate basis for it to accumulate its 1965 and 1966 earnings. On the contrary, the fact that petitioner had approximately $300,000 of working capital invested in idle cash and marketable securities at the beginning of 1965, and that during the years in issue it was seeking to invest these funds in unrelated real estate, is itself an indication that petitioner's further accumulation of 1965 and 1966 earnings was unreasonable and beyond its business needs. Oyster Shell Products Corporation v. Commissioner, 313 F.2d 449, 454 *207 (C.A. 2, 1963), affirming a Memorandum Opinion of this Court; see Helvering v. Stock Yards Co., 318 U.S. 693(1943), Helvering v. Nat. Grocery Co., supra. 26 Furthermore, petitioner's real estate diversification plans were not sufficiently definite at the close of either 1965 or 1966 to justify an accumulation of current earnings. Henry Van Hummel, Inc. v. Commissioner, 364 F. 2d 746 (C.A. 10, 1966), affirming a Memorandum Opinion of this Court, certiorari denied 386 U.S. 956 (1967); *208 Dixie, Inc. v. Commissioner, 277 F. 2d 526 (C.A. 2, 1960), affirming 31 T.C. 415 (1958), certiorari denied 364 U.S. 827 (1960); I. A. Dress Co., 32 T.C. 93, 102-103 (1959), affd. 273 F. 2d 543 (C.A. 2, 1960), certiorari denied 362 U.S. 976 (1960). To be sure, petitioner had retained real estate brokers and had investigated several real estate investment opportunities. However, the record indicates that petitioner's efforts were still exploratory at the end of 1966, and that it had not yet focused its interest on a specific type, location, or value of real estate. Also, there is no evidence to indicate that at any time during petitioner's 10-year search for a real estate investment, beginning in 1962 and continuing through the trial in 1972, it seriously considered committing any funds to a specific real estate venture, other than the $17,000 it invested in a factory building in 1967. Petitioner's failure to ever fully implement its real estate 27 plans in later years is relevant because it sheds some light on the seriousness and specificity of its plans during the years in issue. Sec. 1.537-1(b), Income Tax Regs. *209 , Faber Cement Block, supra, 50 T.C. at 333, John P. Scripps Newspapers 44 T.C. 453, 469 (1965). Petitioner's second diversification ground stems from its participation with other Pathy family corporations in an agreement to help Federal Marine finance the acquisition of equipment. This informal agreement was apparently reached in 1965 when Federal Marine was incorporated for the purpose of purchasing marine terminals and operating them for the exclusive use of Fed. Nav. Petitioner contributed $25,000 of Federal Marine's original capital of $102,500. Before the burden of proof can be shifted with respect to this ground, section 534(c) requires both a clear statement of the ground and a statement of "facts sufficient to show the basis thereof." Although petitioner makes much of this ground on brief, it is not clearly set forth in the 534(c) statement. Furthermore, the only pertinent, "basis" facts alleged in the statement in support of this ground are that in 1968 petitioner purchased a crane at a cost of $165,937 [7] and leased it to Federal Marine and that 28 previously in 1966 Federal Bulk had purchased two cranes at a total cost of $263,800 and *210 leased them to Federal Marine. Neither petitioner's 534(c) statement nor the record as a whole reveal (1) whether the agreement was written or oral, (2) which shareholder or combination of shareholders was to be principally responsible for financing the acquistions, (3) the quantity or value of equipment contemplated by the agreement, (4) the time at which the acquisitions were to be made, or (5) any other relevant facts. Petitioner's statement is therefore inadequate to shift the burden of proof in respect of this ground, and the burden remains on petitioner. Petitioner has plainly failed to carry this burden of proof. A significant fact in this respect is that petitioner did not actually commit any funds under the financing agreement until after Federal Marine approached it in 1968 and requested its assistance. Moreover, the record contains no objective indication that petitioner seriously considered committing any of its funds to Federal Marine at any time prior to 1968. In fact, we think it likely that petitioner put its steadily mounting excess funds at Federal Marine's disposal in 1968 for want of anything else to *211 do with them, especially in view of the 29 apparent lack of any promising real estate investments. We hold that there was no reasonable basis for petitioner to accumulate any of its 1965 or 1966 earnings in anticipation of aiding Federal Marine in its acquisition of equipment. Henry Van Hummell, Inc. v. Commissioner, supra Dixie Inc. v. Commissioner, supra; I. A. Dress Co. supra.
2. Cyclical Losses In its 534(c) statement and on brief petitioner has argued that it needed to accumulate its 1965 and 1966 earnings in order to provide a cushion against possible downturn in the economy of the shipping industry. To support this ground petitioner has pointed to the severe losses which it suffered during 1960, 1961, and 1962, while the shipping economy was at a low ebb. George's testimony explained the various factors which combine to determine the state of the shipping economy, and postulated that in 1962 a recurrence of the 1960-1962 downturn at some undetermined future time seemed not at all unlikely. However, the principal motive behind both petitioner's termination of its chartering activities in 1962 and its simultaneous entry into the brokerage *212 business was to isolate itself from the rigors of the cyclical shipping economy. 30 George testified on cross-examination that petitioner's change in business had nearly eliminated the possibility of large operating losses. The operating costs of petitioner's brokerage operations were insignificant when compared to those required by its chartering activities and, as noted above, the brokerage business required much less capital. A turnaround in the shipping economy made 1963 and 1964 very profitable years for petitioner, and by the close of 1964 it had accumulated more than $300,000 in working capital. Furthermore, George's testimony indicates that in 1965 and 1966 he expected continued prosperity for the shipping industry. In view of these facts, we hold that during 1965 and 1966 a downturn in the shipping economy posed no apparent or substantial danger to petitioner's brokerage business. Petitioner's argument in its 534(c) statement and on brief that such a danger was a reasonable ground on which to accumulate its 1965 and 1966 earnings would have been pertinent if petitioner had remained in the chartering business, but is clearly untenable in light of the facts. 3.Related *213 Corporations In its 534(c) statement petitioner listed as a ground: 31 A PORTION OF THE EARNINGS AND PROFITS RETAINED BY THE TAXPAYER AS OF THE END OF THE CALENDAR YEARS 1965 AND 1966, AND ALL OF THE EARNINGS AND PROFITS ACCUMULATED BY TAXPAYER DURING THE CALENDAR YEAR 1965, WERE NECESSARY FOR AND WERE ACTUALLY USED FOR INVESTMENT IN RELATED BUSINESS ACTIVITIES. Certain "basis" facts as detailed below were set out, and taking the stated ground at face value we again hold that the burden of proof has shifted to respondent. The record shows that during 1965 and 1966 petitioner invested substantial amounts in related business activities. In 1965 it invested $53,158.43 in Fed. Nav. and $25,000 in Federal Marine. In 1966 it invested another $18,119.44 in Fed. Nav. Nearly all of petitioner's commission income for 1965 and 1966 was derived from Fed. Nav. Throughout 1965 and 1966 petitioner maintained its prior investment of $51,275 in Federal Bulk. petitioner did not contend in its 534(C) statement, nor does the record indicate, that it was seriously contemplating additional capital investments in any of these corporations beyond those mentioned above. We have held, *214 supra, that petitioner had no definite plans during either 1965 or 1966 to purchase equipment for Federal Marine. In addition, respondent has not claimed that any of the funds which petitioner had invested in these corporations were available 32 to meet its business needs, and such funds were not included in the stipulated computation of petitioner's current assets. Given the above, this ground reduces to an argument by petitioner that it was justified in accumulating nearly all of its 1965 earnings and part of its 1966 earnings in order to restore its working capital to the level it had reached before the investments in Fed. Nav. and Federal Marine. Petitioner is in effect asking that it be given a double credit for these investments in the computation of its reasonable business needs. However, neither its 534(c) statement nor the record as a whole offers a tenable rationale for this position. Petitioner's working capital at the beginning of 1965 was plainly more than ample to provide the funds for these investments without any need to be replenished with 1965 and 1966 earnings. Even after the investments in Federal Marine and Fed. Nav., petitioner's working capital totaled *215 in excess of $300,000. Therefore, although the investments in Fed. Nav. and Federal Marine constituted a legitimate, business-related use of surplus funds previously accumulated, respondent has already allowed petitioner credit for these investments and no double credit is warranted. 33 4. Working Capital Petitioner argues for the first time on brief that the working capital needs of its normal day-to-day brokerage operations constituted a ground for its accumulation of 1965 and 1966 earnings. Petitioner therefore must bear the burden of proving the extent of such needs. In his reply brief respondent claims that petitioner's operating cycle was only one month long, and that petitioner needed to maintain its working capital at no more than one-twelfth of its annual operating expenses. Petitioner's arguments reduce to a mere reliance on the "rules of thumb" to which we have occasionally resorted in prior cases. It claims that it is entitled to accumulate sufficient earnings either to pay its operating expenses for an entire year or to maintain its current assets at a level two and one-half times larger than its current liabilities, citing, among others, Bremerton Sun Publishing Co., 44 T.C. 566 (1965), *216 F. E. Watkins Motor Co., 31 T.C. 288 (1958), and J. L. Goodman Furniture Co., 11 T.C. 530 (1948). Petitioner's reliance on these cases is completely misplaced since these rules of thumb are simply guidelines for administrative convenience and are far from absolute. The determination of a corporations's required working capital must, in the end, depend on the relevant facts of each case. 34 Petitioner introduced no evidence in respect of its cash flow, peak or average monthly accounts receivable, collection record, credit policies, credit availability, growth record, or other date necessary to an informed analysis of the working capital required by its brokerage operations. The figures which we have been able to glean from petitioner's income tax returns are both inadequate and unexplained. For example, there is certainly nothing in the record to indicate that petitioner needed a year to collect its accounts receivable. Petitioner has fallen far short of carrying its burden of proving that its normal working capital needs justified an accumulation of 1965 or 1966 earnings. In fact, petitioner's working capital argument smacks of being little more *217 than an afterthought. Cf. Hardin v. United States, 461 F.2d 865 (C.A. 5, 1972). Moreover, the facts available support respondent's claim that petitioner's working capital requirements were minimal. Petitioner was involved in a strictly service business which did not require the maintenance of inventories. Its operating costs were largely limited to salaries and rent. Its credit risks were apparently minimal, since the Pathy family controlled Fed. Nav., the source of nearly all of petitioner's operating income and presumably the debtor on 35 most of its accounts receivable. Fed. Nav. was itself in very sound financial condition. On the facts of this issue we hold that petitioner's working capital needs did not exceed $20,000 at any time during the years in issue. 5. Conclusion In sum, we are hard pressed to find that petitioner's reasonable anticipated business needs totaled more than its working capital requirements of $20,000. Consequently, during both years in issue petitioner's available liquid assets exceeded its reasonable business needs by about $300,000, and its entire earned surplus of $183,595.71 at the beginnnig of 1965 and $256,243.12 *218 at the beginning of 1966 was thus freely available for distribution as dividends to its shareholders. The fact that petitioner permitted its earned surplus to increase even further beyond its reasonable business needs by accumulating its 1965 and 1966 earnings gives rise to the statutory presumption that it was availed of for the purpose of avoiding tax on its shareholders. Sec. 533(a). Furthermore, petitioner has failed to overcome this presumption by a preponderance of the evidence. The other factors in this case, on balance, actually reinforce the presumption of section 533(a) that petitioner was availed of for the proscribed tax avoidance purpose. Petitioner attributes great importance to the fact that George could have caused petitioner to declare a large dividend at the close of 1962 and thereby removed its excess capitalization at a supposedly small tax cost because of its diminished earnings and profits. It argues Conclusion In if George had been concerned with saving dividend taxes, he would have liquidated petitioner's excess funds at that time. However, such a course of action would have involved a substantial tax cost to George, since petitioner's earnings *219 and profits at the close of 1962 were approximately $30,000. Moreover, there is very little evidence to indicate that George seriously considered withdrawing petitioner's excess funds in 1962, or that he was aware of the tax effects of his 1962 decision. Even if George had withdrawn a substantial amount of funds in 1962, petitioner's accumulation of its high earnings for 1963 and 1964 might still have subjected it to an accumulated earnings tax for the years in issue. The strictly hypothetical nature of petitioner's argument leaves it with little, if any, relevance. Petitioner also attaches importance to the fact that there is no record of its advancing funds to its shareholders in the form of loans or otherwise. It is true that the lack of any loans from petitioner to its shareholders is a factor in 37 its favor. See e.g., Sandy Estate Co., supra at 378. However, a more important factor is petitioner's history of never having declared a cash dividend from its formation in 1941 until January 31, 1967. A poor dividend record is of course a very important indication that petitioner was availed of for the purpose of avoiding taxes on its shareholders. The stock *220 dividend which petitioner declared in 1965 and paid in 1966 was nontaxable and therefore had no effect on earnings and profits other than concealment. Sec. 312(d). Consequently, such a nontaxable stock dividend had no effect on petitioners earnings and profits for purposes of the accumulated earnings tax. U-Z Sew Enterprises, Inc. v. United States, 260F. Supp. 100, 122-123 (E.D. Mich. 1966); Rev. Rul. 65-68, 1965-1 C.B. 246. In view of the above, we are convinced that petitioner was availed of for the purpose of avoiding income tax on its shareholders, and we hold that petitioner is liable for the accumulated earnings tax for 1965 and 1966. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified. ↩
*. Petitioner's operating losses for these three years totaled approximately $100,000. **This is the remainder after $200,000 was transferred from earned surplus to capital stock in January 1966. ↩
2. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose, - For purposes of section 532, the fact that the earings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. ↩
3. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) if the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a) the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. * * * (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. ↩
4. It is now stipulated that petitioner's "accumulated taxable income" (sec. 535) for 1965 and 1966 was $76,574.47 and $66,765.93, respectively. ↩
5. See also, Bardahl Manufacturing Corp., T.C. Memo. 1965-200↩. 6. Of course, petitioner acquired an interest in real estate related to its business in April 1965 when it invested $25,000 in Federal Marine. However, petitioner has not argued that its original investment in Federal Marine was a part of its real estate diversification program, and the record indicated that this investment was an independent venture designed solely for the benefit of Fed. Nav. and having no relation to petitioner's real estate plans. One item of correspondence dated January 16, 1968, discusses a warehouse in Toronto, Ontario, but it is abundantly clear from the description thereof that it was strictly a potential source of rental income. ↩
7. This cost is now stipulated to be $172,990.27. ↩