T.C. Memo. 2001-19

UNITED STATES TAX COURT

KNIGHT FURNITURE CO., INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15369-99.          Filed January 29, 2001.

<u>Samuel W. Graber</u> and <u>Jason W. Richardson</u>, for petitioner.

<u>James F. Prothro</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies of
$94,876, $75,398, and $62,569 in petitioner's Federal income tax
for 1995, 1996, and 1997, respectively.  The sole issue for
decision is whether, for each of the years in issue, petitioner
was a corporation described in section 532, i.e., a corporation
availed of for the purpose of avoiding income tax with respect to

its shareholders, by permitting its earnings and profits to accumulate rather than to be divided and distributed, and was thus liable for the accumulated earnings tax imposed by section 531.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Knight Furniture Co., Inc., is a corporation with its principal place of business in Sherman, Texas. Petitioner operates two furniture stores. Petitioner's main store is located in Sherman, Texas, and its other store is located in Gainesville, Texas.

During the years in issue, petitioner's officers were Jim Hughes as chairman, Sam Knight as president, Henry Griffin as vice president, and David Gunn as treasurer. David Pedigo served as secretary in 1995 but was removed and replaced by David Gunn, who served as both secretary and treasurer in 1996 and 1997.

David Pedigo remained an employee of petitioner even though he was removed from the board in January 1996. He received the same annual salary of $50,000 but was no longer eligible for management bonuses. The board also removed David Pedigo from

several job responsibilities.  David Pedigo was shocked by his removal from the board and by the major changes to his employment responsibilities and income, but he did not retaliate and did not threaten to quit.

Liquid Assets

Petitioner sustained increases in the amount of its retained earnings and profits, during the years in issue, as follows:

| Year | Retained Earnings & Profits | Increase in Amount |
|------|-----------------------------|--------------------|
| 1995 | $6,450,910 | $243,273 |
| 1996 | 6,644,238 | 193,328 |
| 1997 | 6,804,671 | 160,433 |

Petitioner's short-term investments were primarily certificates of deposit and money market funds.  Petitioner's cash on hand and short-term investments were $1,976,779, $1,599,756, and $2,038,430 at yearend 1995, 1996, and 1997, respectively.

Petitioner historically and as a matter of corporate policy maintained high levels of liquidity.  Petitioner also had a policy of not incurring substantial amounts of debt. Petitioner's liquid assets available for 1995 through 1997 were as follows:

|                          | 1995        | 1996        | 1997        |
|--------------------------|-------------|-------------|-------------|
| Current Assets:          |             |             |             |
| Cash                     | $  818,960  | $  381,039  | $  945,413  |
| Accounts receivable      | 2,569,616   | 2,565,656   | 2,334,468   |
| Inventories              | 651,151     | 692,309     | 659,987     |
| U.S. Govt. obligations   | 1,157,819   | 1,218,717   | 905,017     |
| Certificates of deposit  | --          | --          | 188,000     |
| Less Current Liabilities:|             |             |             |
| Accounts payable         | (172,506)   | (125,570)   | (123,562)   |
| Federal tax payable      | (55,014)    | --          | --          |
| Net liquid assets        | $4,970,026  | $4,732,151  | $4,909,323  |

## Stock Ownership and Redemption

At the time that petitioner incorporated in 1927, two brothers owned all of petitioner's stock. All of petitioner's stock has since been owned by the descendants of the two brothers or spouses of the descendants. The Knight family, consisting of Sam and Jan Knight, David and Gina Gunn, and Jeremy Knight, were the controlling stockholders of petitioner during the years in issue. During 1995, the Knight family held 51 percent of the total outstanding stock. The Pedigo family, consisting of Paul Pedigo, David and Sharon Pedigo, and Steve and Susan Pedigo, held 47 percent of the total outstanding stock.

During 1996, the Knight family owned 56 percent and the Pedigo family owned 42 percent of the outstanding stock. After David Pedigo's demotion and removal from the board in January 1996, the stockholders met on March 26, 1996, to elect a new board. David Pedigo nominated himself, and his wife, Sharon

Pedigo, seconded his nomination, but David Pedigo was not elected to the board.

During 1997, the Knight family owned 56 percent and the Pedigo family owned 42 percent of the total outstanding stock. At the March 25, 1997, annual stockholders meeting to elect a new board, David Pedigo did not nominate himself but had the minutes reflect that both he and his wife opposed the nominated list. David Pedigo requested clarification of his standing with the company, and Sam Knight explained that David Pedigo's performance would be the determining factor and that, as of that time, there was no action pending that would change his status with the company. David Pedigo had not requested redemption of his stock as of the time of trial in June 2000.

Stockholders were forbidden, by corporate bylaws, from selling their stock to unrelated third parties, without the unanimous consent of all of the stockholders. Petitioner's corporate bylaws, as amended May 25, 1989, provide the following guidelines for the sale of stock by stockholders:

> Stock is first offered to stockholders - then to the Corporation. The Corporation can redeem the stock only to the extent it has funds available.

> If no funds [are] available, the Corporation will pay the seller 10 percent of the sales price and give a ten year note, secured by the stock, for the balance upon which he will be paid interest. The interest will be figured annually on the anniversary date of the sale and will be based on the latest six month T-Bill interest quotes.

The funds available for redemption of stock will be determined by the Board of Directors. The notes can be paid off early without penalty at the discretion of the Board of Directors.

Petitioner amended its bylaws on May 25, 1989, to include the option to pay 10 percent of the sales price and give a 10-year note for stock redemptions, because its sales volume dropped in the previous 2 years and the board was concerned about whether the company could survive a stock redemption. Petitioner's policy has been to pay cash for stock redemptions.

Petitioner adopted a formula by which it would value its stock. The formula price per share was determined as 10 times the average earnings per share for the previous 5 years, plus the book value, then divided by 2. The redemption price per share, based on the formula, was $2,682.62, $2,798.07, and $2,836.52 in 1995, 1996, and 1997, respectively. Petitioner used this formula consistently for every redemption. If all of the Pedigo family members had sought redemption of their stock, the redemption would have required $1,975,750, $2,044,847, and $1,697,657 in liquid assets in 1995, 1996, and 1997, respectively.

The only shares redeemed during the years in issue were 138 shares that Paul Pedigo inherited in 1993 and sold in 1996 for $370,201.56. Paul Pedigo was not an officer or employee and was not involved in petitioner's business. He had been a music educator for 30 years and retired shortly after the redemption of his shares. Paul Pedigo wanted to invest the money to provide

for his retirement income, and the redemption of his shares was not motivated by David Pedigo's reduced responsibilities at the store.

Other redemptions of stock occurred before and after the years in issue. On December 22, 1988, Paul Pedigo redeemed 13.5 shares that he had inherited from his mother. Jan Knight redeemed 140 shares on January 16, 1998, for $352,556.82. Sharon Pedigo, wife of David Pedigo, redeemed 80 shares in May 1998 for $226,921.60 to obtain funds to buy a new home and to pay for the college tuition of her two daughters.

On January 29, 1996, Steve Pedigo wrote a letter to Sam Knight and to petitioner discussing the then recent demotion and removal of David Pedigo from the board. His letter, in part, stated:

> The manner in which the board of Knight Furniture Company has redefined David Pedigo's responsibilities and disseminated the announcement appears to be designed to undermine David's credibility with his peers and co-workers. Restricting David from physical locations within the store was mean-spirited and petty and designed to reduce David's credibility and compromise his dignity.
>
> As I understand the bylaws of Knight Furniture Company, a change in the board of directors requires a vote of all shareholders including David, * * * [Paul] and myself. It appears that the board is attempting to make a change without the appropriate vote.
>
> In looking at the stock ownership, except for token amounts owned by Jimmy H. Hughes and Henry Griffin, the remainder of the stock is owned by either the Ed Pedigo family or the Sam Knight family. I would hope the recent events have not been orchestrated to force the Pedigo family to sell.

Ron Bostwick (Bostwick), petitioner's certified public accountant, met with the board of directors annually to explain the yearend financial statements, and he routinely advised petitioner in determining its working capital needs.  Bostwick stressed to the board the need to hold sufficient capital reserves to fund the contingent stock repurchases from nonparticipating stockholders when the board met on February 2, 1993; February 24, 1995; March 8, 1996; March 4, 1997; and February 28, 1998.  Bostwick also advised petitioner that it should provide funding for the redemption of stock from its working capital and that it should not look to current earnings. At the December 8, 1995, board meeting, the board decided that adequate funds were necessary to its future stability.

Class Action Lawsuit

In January 1994, petitioner was sued as part of a class action lawsuit concerning credit life insurance purchased by some of its customers.  Petitioner carried a commercial insurance policy and an umbrella insurance policy, but neither provided coverage for the conduct alleged in the lawsuit.

The potential liability exposure of the class action lawsuit was unknown to petitioner for several reasons.  First, petitioner's insurance company refused to defend and indemnify petitioner.  Second, damages were not quantified by plaintiffs. Third, petitioner could be liable for actual damages, treble

damages for deceptive trade practices, punitive damages, and plaintiffs' attorney's fees. Fourth, class action cases are more expensive to defend than routine insurance cases, because there are many parties involved, a great deal of discovery, a lengthy certification process, and a lengthened time frame for final resolution of the case.

The cost of legal fees was a substantial concern to petitioner. Petitioner's defense counsel provided an estimate of attorney's fees in excess of $100,000. The actual legal fees that were paid for petitioner's defense were $9,982, $6,816, and $5,294 in 1995, 1996, and 1997, respectively.

While petitioner's defense counsel was concerned about the credit life insurance scenario in which petitioner participated, counsel was of the opinion that petitioner had not participated in deceptive trade practices. Petitioner's officers maintained that they did not participate in deceptive trade practices and were comfortable with what they had done.

The class action lawsuit was removed to bankruptcy court, because the primary defendants filed bankruptcy. Petitioner's defense counsel advised petitioner, in a letter dated June 19, 1995, that plaintiffs filed a Motion to Dismiss and that "plaintiffs may be considering dismissal of the adversary proceeding in the bankruptcy case so that they can refile in another court" or a "less restrictive forum". Petitioner was dismissed from the lawsuit in 1995. In a letter dated

February 21, 1996, petitioner's defense counsel again advised petitioner that "there is some possibility that the Plaintiff will somehow structure a case with other individuals or with other issues which could possibly be filed against * * * [petitioner] and the other defendants".

Bostwick advised petitioner not to plan to pay for contingencies out of current earnings and profits and to set aside funds in the amount that petitioner's defense attorneys advised. At the February 18, 1994, and February 24, 1995, board meetings to review petitioner's capital reserves, Bostwick advised petitioner to hold sufficient capital reserves to serve as a contingency fund for situations that required legal counsel.

Business Expansion Plans

Petitioner was interested in expanding into McKinney, Texas, because it was a rapidly growing market. McKinney is about 30 miles south of Sherman on a major thoroughfare. Petitioner has a centralized warehouse that could service the store in McKinney and the surrounding area.

On May 7, 1993, petitioner's board met to discuss the possibility of opening a store to sell furniture in the area of McKinney. Sam Knight and David Gunn were appointed to investigate the possibilities further by viewing sites for the new store. Thereafter, Sam Knight and David Gunn contacted Kelly Davis (Davis), a real estate agent, to inquire about available properties in McKinney.

Petitioner was generally interested in properties along highways and was looking for a building to either lease or buy for a furniture store. Davis notified petitioner of properties available in the McKinney area, and approximately six of these properties were viewed by Sam Knight and David Gunn. Davis also notified petitioner of about a dozen parcels of vacant land.

At the July 9, 1993, board meeting, Sam Knight and David Gunn reported that there were no suitable existing buildings available in McKinney at the time. The board reiterated the need to hold sufficient capital reserves to accommodate the possible addition of the McKinney store and estimated the McKinney store could cost $300,000 to $400,000 for the land and in excess of $500,000 for building costs. At this meeting, the board also discussed a possible store opening in the Bonham/Fannin County area. After a full discussion, no specific action was taken, and both store site considerations were tabled for further discussion.

At the May 20, 1994, board meeting, the board discussed the possibility of a future store location in the Bonham area. Recent reports indicated that new businesses, new housing, and new jobs meant an increased customer potential for the store. There was no decision as to the future store location, other than to continue to monitor the growth in Bonham.

In 1996, Davis showed to Sam Knight and David Gunn an old grocery store that was of interest to them, but it was leased

within a day to someone else. In 1996, an old Wal-Mart building in Bonham that was bigger than what petitioner needed became available, but the lessor did not want to lease only a portion of the building. Properties were last reviewed in McKinney in 1996.

In 1997, the board again considered the possibility of a store in Bonham, but most options would have involved the purchase of land and construction of a building, which the board felt was cost prohibitive. The board decided that consideration would still be given for the right opportunity.

At the February 24, 1995, and March 4, 1997, board meetings, Bostwick advised the board that a safe level of cash reserves was necessary to finance possible future store locations and that the Board should set aside adequate retained earnings to fund such projects.

Despite efforts to locate suitable property, petitioner did not purchase or lease another store location during the years in issue. Petitioner had concerns regarding its expansion, because it feared a possible rift in the family in 1995 when it removed David Pedigo from the board and reduced his job responsibilities. Also, Lay-Z-Boy, which was petitioner's number one vendor and a nationally recognized quality furniture manufacturer, would not allow petitioner to put its products into the McKinney market because Lay-Z-Boy already covered the McKinney market.

Repairs and Renovations

Petitioner's board minutes document several discussions and decisions by the board to make major repairs and renovations to its assets. At the August 5, 1994, board meeting, the board addressed the need to reroof the Jones Street warehouse and the main warehouse, to repair the firewalls in the main building, and to purchase a new delivery truck. In the December 2, 1994, and December 8, 1995, board minutes, the board listed several items that would require a considerable expenditure of its reserves: (1) General maintenance, such as reroofing, repainting, and improving parking; (2) replacement of the delivery fleet; and (3) remodeling. On January 20, 1995, David Gunn updated the board on the computer situation, and the board moved to proceed with a new computer system that would cost in excess of $50,000.

Petitioner also decided to expand the Lay-Z-Boy line and to devote more square footage to the product. The Lay-Z-Boy gallery was discussed and approved by the board of directors in 1995, and construction began in early 1996. Construction entailed the closing off and gutting of a significant amount of square footage in the store. Merchandise was relocated, and other renovations were done to house those goods. The costs incurred by petitioner, other than building improvements and renovations, included the purchase of a large exterior sign and the acquisition of inventory. The renovation project was completed in March 1996.

Dividend History

At the suggestion of Bostwick, the board unanimously approved an increase in cash dividends at the February 18, 1994, board meeting.  Petitioner's taxable income, net book income, and dividends paid for years 1995 through 1997 were as follows:

| Year | Taxable Income | Net Book Income | Total Dividends Paid | Dividend Per Share |
|------|------|------|------|------|
| 1995 | $390,935 | $258,938 | $15,665 | $10 |
| 1996 | 298,772 | 208,993 | 15,665 | 10 |
| 1997 | 248,978 | 174,718 | 14,285 | 10 |

Petitioner has a history of making regular, annual dividend payments to its stockholders.  Petitioner's payments of dividends, over the years in issue, averaged 5 percent and 7 percent of petitioner's taxable and net book incomes, respectively.

OPINION

As a result of the examination of the years in issue, respondent determined that petitioner's earnings and profits exceeded the reasonable needs of its business.  Respondent determined that the accumulated earnings tax applied to petitioner's accumulated taxable income of $243,273, $193,328, and $160,433 for 1995, 1996, and 1997, respectively, and determined deficiencies of $94,876, $75,398, and $62,569 for 1995, 1996, and 1997, respectively.

Respondent, in accordance with section 534(b), sent to petitioner a notification informing petitioner that a proposed

statutory notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531 for 1995, 1996, and 1997. Petitioner, in accordance with section 534(c), timely submitted a statement setting forth the grounds upon which it relied to establish that all or part of its retained earnings for the years in issue have not been permitted to accumulate beyond the reasonable needs of its business.

The grounds relied upon by petitioner in its statement were as follows:

1. Liquidity. The company was not as highly liquid as other companies that have been found to have unreasonably accumulated earnings.

2. Investment in Assets Unrelated to Business. The company held low earning, highly liquid investments unrelated to its business in order to pay for its future business needs and contingent liabilities.

3. Redemption of Stock of Dissenting Stockholders. The company faced the contingent need to redeem the stock of the dissenting Pedigo family stockholders.

4. Class Action Lawsuit. The company faced the contingent liability for damages as a defendant in a class action lawsuit.

5. Business Expansion Plans. The company had definite, substantial business plans to expand its business.

6.  Repairs and Renovations.  The company had both anticipated needs and made significant repairs and renovations to its assets.

7.  Dividend History.  The company had a history of paying regular dividends.

Petitioner's statement provided varying degrees of detail as to the different grounds.  Petitioner filed a Motion to Shift Burden of Proof to respondent.  See Rule 142(e).  We granted petitioner's Motion to Shift Burden of Proof as to grounds 3 and 5 set forth above.

The sole issue for decision is whether, for each of the years in issue, petitioner was availed of for the purpose of avoiding income tax with respect to its shareholders, within the meaning of section 532, and was thus liable for the accumulated earnings tax imposed by section 531.

The accumulated earnings tax is imposed on the accumulated taxable income of every corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed.  See secs. 531 and 532. The purpose of the accumulated earnings tax is to compel the company to distribute any profits not needed for the conduct of its business so that individual stockholders will become liable for taxes on the dividends received.  See Ivan Allen Co. v. United States, 422 U.S. 617, 626 (1975); United States v. Donruss

Co., 393 U.S. 297, 303 (1969); Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 699 (1943). The tax is considered to be a penalty and, therefore, has been strictly construed. See Ivan Allen Co. v. United States, supra at 626.

Earnings and profits of a corporation permitted to accumulate beyond the reasonable needs of the business are determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation proves otherwise by a preponderance of the evidence to the contrary. See sec. 533(a); Technalysis Corp. v. Commissioner, 101 T.C. 397, 403 (1993); Hughes, Inc. v. Commissioner, 90 T.C. 1, 16 (1988); Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 269 (1986).

Pursuant to section 534, the burden of proof was shifted to respondent to demonstrate that petitioner's accumulation of earnings and profits for stockholder redemptions of stock and business expansion plans was beyond petitioner's reasonable needs. The burden of proof remains on petitioner as to the other grounds asserted. The ultimate burden of proving that petitioner was not availed of for the prohibited statutory purpose is and remains upon petitioner. See American Metal Prods. Corp. v. Commissioner, 34 T.C. 89, 99 (1960), affd. 287 F.2d 860 (8th Cir. 1961); Pelton Steel Casting Co. v. Commissioner, 28 T.C. 153 (1957), affd. 251 F.2d 278 (7th Cir. 1958).

A. Net Liquid Assets

The accumulated earnings and profits of prior years are taken into consideration in determining whether any amount of the earnings and profits of the taxable year has been retained for the reasonable needs of the business.  See sec. 1.535-3(b)(1)(ii), Income Tax Regs.  The critical factor is not the monetary size of the accumulated earnings and profits, but the corporation's liquid position and the relation of that position to the corporation's current and anticipated needs.  See Ivan Allen Co. v. United States, supra at 628; Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 329 (1968).  Thus, the first step is to determine petitioner's net liquid assets for the purpose of determining the funds available to petitioner to meet its business needs.  See Wilcox Manufacturing Co. v. Commissioner, T.C. Memo. 1979-92 (citing Faber Cement Block Co. v. Commissioner, supra at 330).  Petitioner's liquid assets available are calculated as current assets less current liabilities for each tax year in issue.  The parties have stipulated that the amounts of petitioner's net liquid assets were $4,970,026, $4,732,151, and $4,909,323 in 1995, 1996, and 1997, respectively.

Investments in properties or securities that are unrelated to the activities of the business of the taxpayer corporation may also indicate that earnings and profits of a corporation are being accumulated beyond the reasonable needs of the business. See sec. 1.537-2(c), Income Tax Regs.  We have considered

petitioner's liquidity ratio and investments unrelated to its business and are satisfied that these factors are included in the above calculation of petitioner's net liquid assets.

B. Reasonable Needs of the Business

The second step is to decide whether the grounds asserted by petitioner justify the accumulation of earnings and profits for its reasonable business needs. The term "reasonable needs of the business" includes "the reasonably anticipated needs of the business." Sec. 537(a).

The need to retain earnings and profits must be directly connected with the needs of the corporation, itself, and must be for bona fide business purposes. See sec. 1.537-1, Income Tax Regs. The regulations adopt a "prudent businessman" standard for determining whether earnings have been accumulated beyond the present and reasonably anticipated future needs of the business. Section 1.537-1, Income Tax Regs., states, in part:

> An accumulation of the earnings and profits * * * is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business.

Thus, determining the reasonable needs of a business is, in first instance, a question for the officers and directors of the corporation. See Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 269 (1986); John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 468 (1965); Crawford County Printing & Publishing Co.,

17 T.C. 1404, 1414 (1952). Courts should be hesitant to substitute their judgment and attribute a tax-avoidance motive unless the facts and circumstances clearly warrant the conclusion that the accumulation of earnings and profits was unreasonable and for the proscribed purpose. See Snow Manufacturing Co. v. Commissioner, supra at 269; Atlantic Properties, Inc. v. Commissioner, 62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975); Faber Cement Block Co. v. Commissioner, supra at 329; John P. Scripps Newspapers v. Commissioner, supra at 468.

Whether a particular ground or grounds for the accumulation of earnings and profits indicate that the earnings and profits have been accumulated for the reasonable needs of the business or beyond such needs is dependent upon the particular circumstances of the case. Sec. 1.537-2(a), Income Tax Regs. Taking into consideration the applicable burden of proof, we address each of the grounds asserted by petitioner in justifying its accumulation of earnings and profits for its reasonable business needs.

1. Working Capital Needs for Operating Cycle

Earnings retained to provide for working capital requirements are accumulated for the reasonable needs of the business. See sec. 1.537-2(b)(4), Income Tax Regs. The working capital needs of a business are commonly evaluated by means of the "Bardahl formula". See Technalysis Corp. v. Commissioner, 101 T.C. 397, 407 (1993); Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200. The parties have separately

determined for the close of each of the years in question the amount of working capital that is reasonably needed to cover a single operating cycle of petitioner.  Petitioner determined the working capital for one operating cycle to be $3,877,503, $4,090,630, $3,885,163 in 1995, 1996, and 1997, respectively. Respondent determined the working capital for one operating cycle to be $3,735,858, $3,863,008, $3,737,073 in 1995, 1996, and 1997, respectively.  Petitioner used monthly balances to compute the annual average balances of its inventory and accounts receivable, whereas respondent used yearend balances to determine the annual average balances.  We adopt respondent's calculation because the yearend balances respondent uses have been stipulated by the parties.  The difference in the calculations, however, does not affect the result in this case for the reasons appearing below.

2.  Redemption of Stock of Dissenting Minority Stockholders

Petitioner contends that there was an actual redemption of stock during the years in issue and a manifest dissent among the Pedigo stockholders.  Petitioner's officers believed that the action to remove David Pedigo, a large stockholder, as a corporate officer and reduce his employment responsibilities would strain the relations between the Knight and Pedigo families and could result in the redemption of stock by the Pedigo family.

Respondent argues that it was not a reasonably anticipated need of the business to accumulate earnings and profits for the redemption of stock of minority stockholders.  Respondent

contends that the three Pedigo brothers were not dissenting stockholders and that the Pedigo redemption of stock would not hurt management, because the Knight family already had 51 percent of the voting power of the stock and control over the board and management of petitioner. Respondent views petitioner's policy of redeeming stock fully in cash as a retirement vehicle that allowed stockholders to obtain favorable tax treatment when they reached retirement age. Respondent also claims that the redemption of stock does not threaten the survival of the business or impair the corporation's ability to continue as a profitable concern.

The redemption of the stock of dissenting, minority stockholders is a reasonable need of the business where the ability to redeem the stock of dissenting, minority stockholders appears necessary to preserve the existence of the corporation, or, at least necessary to promote the harmony in the conduct of a business. See Wilcox Manufacturing Co. v. Commissioner, T.C. Memo. 1979-92; Farmers & Merchants Inv. Co. v. Commissioner, T.C. Memo. 1970-161.

The Pedigo family owned less than 50 percent of the stock in petitioner. Based on the evidence, it was reasonable for petitioner's officers to believe that there was dissent and discord between management and the minority stockholders. The facts and circumstances that were known to petitioner's officers include the demotion of David Pedigo in January 1996; the removal

of David Pedigo from the board of directors in January 1996; the actual redemption of the stock of David Pedigo's brother, Paul Pedigo, in April 1996; and the correspondence from Steve Pedigo in January 1996 to the board stating: "I would hope that recent events have not been orchestrated to force the Pedigo family to sell." Additionally, the Pedigo family was unable to elect David Pedigo to the board of directors at the March 1996 annual stockholders meeting, and the 1997 minutes reflect the opposition of David and Sharon Pedigo to the election of the board of directors.

Based on the facts and circumstances, we believe that petitioner's officers were exercising their prudent business judgment in preparing for the redemption of stock by the Pedigo family stockholders. We are convinced that petitioner did not want the redemption of the stock by its stockholders to affect the stability of its business or to threaten the management of the business.

Petitioner's stockholders were limited by the corporate bylaws from selling their stock to unrelated third parties without the unanimous consent of all of the stockholders. Stockholders could either sell to existing stockholders or have their stock redeemed by petitioner. The restriction on the transfer of stock in petitioner's bylaws served the purpose of maintaining control over management and keeping ownership in the hands of the stockholders who managed the company.

Petitioner also had a policy of not incurring debt and a history of redeeming the stock of stockholders in full, upon request, even though the bylaws provided for the option of paying 10 percent of the sales price and giving a 10-year note. Petitioner added the option of paying 10 percent of the sales price and giving a 10-year note as a precautionary measure to ensure the survival of its business after several poor fiscal years. Petitioner was also continually advised by its certified public accountant to hold sufficient capital reserves to fund the contingent stock repurchases from its nonparticipating stockholders.

Respondent has not met his burden of proving that the accumulation of earnings to redeem the stock of minority stockholders was not a reasonable accumulation of earnings and profits. Respondent provided evidence in an attempt to demonstrate that the actual redemptions of stock were for reasons unrelated to dissent. Such reasons, however, were not known to petitioner's officers at the time of the accumulations and, therefore, are unpersuasive in analyzing the business judgment of petitioner's officers at the time they decided to accumulate earnings and profits for the redemption of stock of stockholders.

Respondent argues, in the alternative, that it was reasonable for petitioner to accumulate 10 percent of the total amount needed to redeem the stock of stockholders as provided for in petitioner's bylaws, because petitioner could finance the

remaining 90 percent by giving a 10-year note.  We have previously held that the Commissioner cannot effectively compel taxpayers to incur debt rather than to utilize accumulated earnings and profits and that the reasonableness of accumulations should be judged without regard to the borrowing capacities of a corporate taxpayer.  See General Smelting Co. v. Commissioner, 4 T.C. 313, 323 (1944); C.E. Estes, Inc. v. Commissioner, T.C. Memo. 1980-504.  Once an expenditure is deemed to be a reasonable need of the business, that a corporation chooses to finance the expenditure from earnings and profits rather than from debt should not place the corporation in a position of being subjected to the accumulated earnings tax.  See John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 468 (1965).  Based on petitioner's historical aversion to debt, conservative financial management philosophy, and policy of redeeming the stock of stockholders fully in cash, respondent cannot require petitioner to exercise its safety net provision in its bylaws that allowed it to pay 10 percent down and incur debt for the remaining portion.  In this case, the working capital accumulation would not have covered a full redemption of the stock of the Pedigo stockholders, and petitioner might still have needed to exercise the option of financing a portion of the redemption of stock to ensure the survival of the business.

The events that were known to petitioner's officers that compelled them to retain earnings and profits for the redemption

of the stock of minority, dissenting stockholders began in January 1996; thus, it was reasonable for petitioner to accumulate its 1995 earnings and profits for the purpose of redeeming the stock of stockholders. The events continued into 1996 with the redemption of Paul Pedigo's stock and the continuing opposition to the board of directors election at the 1996 and 1997 annual stockholders meetings. Thus, petitioner's accumulation of earnings was also reasonable at the end of both 1996 and 1997.

A complete redemption of all of the stock held by the Pedigo family members would have required $1,975,750, $2,044,847, and $1,697,657 in 1995, 1996, and 1997, respectively. We conclude that the amounts needed to redeem the stock of minority stockholders were a reasonable business need that justified the accumulation of earnings and profits.

### 3. Class Action Lawsuit

Petitioner contends that the accumulation of its earnings and profits was a direct result of being named as a defendant in a class action lawsuit and was a provision for attorney's fees in the defense of the lawsuit and a reserve for the potential liability of an unspecified amount of damages. Petitioner argues that these circumstances justify the accumulation of reserves to meet a contingency, which is a reasonable need of the business.

Respondent contends that the accumulation of earnings and profits was not necessary to defend against the lawsuit or to

provide for possible damages, because the lawsuit was dropped in June 1995 and the lawsuit was never refiled against petitioner.

In Steelmasters, Inc. v. Commissioner, T.C. Memo. 1976-324, the taxpayer was a defendant in a major civil suit during the 2 tax years in issue. During the first year in issue, the taxpayer was faced with the possible entry of an adverse judgment, and the taxpayer was advised by counsel of its potential exposure and its division of the liability. By the second year in question, the judgment was entered, causing the liability to become fixed. The Court reasoned that uncertainties regarding outcome are inherent in any litigation and held that it was entirely reasonable for the taxpayer's officers to permit earnings to accumulate as a means of insulation. See id.

Similar to Steelmasters, Inc., the class action lawsuit that petitioner faced was also a present and pending contingency in 1995. At the close of 1995, petitioner's officers knew that petitioner had been dismissed as a defendant in the adversary proceeding in the bankruptcy case, but petitioner was also advised by its attorneys that the plaintiff could refile the case in another forum. Petitioner also knew that its insurance company refused to defend it in the lawsuit and that its attorneys provided an estimate of attorney's fees in excess of $100,000. Petitioner also maintained that it had not participated in deceptive trade practices and that its officers were comfortable with what they had done. Based on the facts and

circumstances known to petitioner's officers, a prudent businessman would consider it appropriate to accumulate at least $100,000 for the purpose of defending the lawsuit in the event that the lawsuit was refiled.  However, the lawsuit was not refiled in 1996.  The lawsuit then ceased to be a contingency for petitioner, and the accumulation of earnings and profits for this business purpose was no longer necessary.

### 4.  Business Expansion Plans

Petitioner maintains that, even though not every contact regarding its efforts to expand its business was reflected in the board of directors minutes, it had a business plan to expand and took active steps toward expanding its business.

Respondent contends that petitioner had no specific, definite, and feasible business expansion plan during the years in issue, but rather that petitioner's expansion plan was vague, undefined, and uncertain.  Respondent contends that no plan of expansion had been committed to and that no substantial steps had been taken to achieve implementation.

A business may accumulate earnings and profits to provide for the bona fide expansion of its business.  See sec. 1.537-2(b)(1), Income Tax Regs.  Section 1.537-1(b), Income Tax Regs., explains, in part, how a corporation must justify the accumulation of earnings and profits for reasonably anticipated future needs:

In order for a corporation to justify an accumulation of earnings and profits for reasonably anticipated future needs, there must be an indication that the future needs of the business require such accumulation, and the corporation must have specific, definite, and feasible plans for the use of such accumulation. Such an accumulation need not be used immediately, nor must the plans for its use be consummated within a short period after the close of the taxable year, provided that such accumulation will be used within a reasonable time depending upon all the facts and circumstances relating to the future needs of the business. Where the future needs of the business are uncertain or vague, where the plans for the future use of an accumulation are not specific, definite, and feasible, or where the execution of such a plan is postponed indefinitely, an accumulation cannot be justified, on the grounds of reasonably anticipated needs of the business.

The requirement of a "specific, definite, and feasible" plan does not demand that a taxpayer produce meticulously drawn, formal blueprints for action. See Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 332 (1968); John P. Scripps Newspapers v. Commissioner, 44 T.C. 453, 469 (1965). A corporation, however, cannot immunize itself from the accumulated earnings tax merely by referring to expansion in its corporate minutes. See Faber Cement Block Co. v. Commissioner, supra at 332. Definiteness of a plan coupled with action taken towards its consummation are essential to justify an accumulation as reasonable. See Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 274 (1986) (citing Dixie, Inc. v. Commissioner, 277 F.2d 526, 528 (2d Cir. 1960), affg. 31 T.C. 415 (1958)).

The record indicates that during the years in issue petitioner considered a number of different properties. However,

a plan is not created simply by adding together the number of sites considered.  See id. at 277.

Petitioner's corporate minutes document discussions of the possibility of opening stores in McKinney or Bonham, but no specific action was taken by the board because the available properties were not suitable.  We realize that not all of the actions and decisions of the board of directors are documented in the corporate minutes, and we have considered the testimony of the corporate officers and petitioner's realtor.

Based on the facts and circumstances, we agree with respondent.  Petitioner had an intent to expand its business and seriously investigated the possible expansion into McKinney or Bonham by considering specific properties.  However, no specific, definite, and feasible business expansion plan materialized from the research.  We conclude that petitioner had neither developed a business expansion plan that was definite, specific, and feasible nor taken a substantial step to implement a business expansion plan.

Respondent has met his burden of proof in demonstrating that petitioner did not have a specific, definite, and feasible business expansion plan during the years in issue and that it was not reasonable for petitioner to accumulate its earnings and profits for this purpose.

5.  Repairs and Renovations

Petitioner argues that its accumulated earnings and profits were justified to meet repair and renovation expenses. Respondent, appropriately, reduced the amount of excess accumulated earnings and profits for each year in issue, by the actual cost of petitioner's capital purchases.  These reductions include $74,669 primarily for the computer system purchased in 1995, $70,445 for renovations in 1996, and $34,024 for carpet and computer equipment in 1997.  No further accumulation for this purpose has been justified by petitioner.

6.  Dividend History

Petitioner argues that it has a history of consistently distributing regular, annual dividend payments to its stockholders.  Petitioner believes that the payment of additional dividends might have been a breach of its fiduciary duties to its stockholders by threatening the existence of the corporation and not providing for the reasonable needs of its business.

Respondent contends that dividends that were paid by petitioner have been nominal in amount.  Petitioner paid dividends that amounted to $10 per share and totaled $15,665, $15,665, and $14,285 in 1995, 1996, and 1997, respectively. Dividends that were paid averaged 5 percent to 7 percent of petitioner's taxable and net book incomes, respectively.

The extent to which earnings and profits have been distributed by the corporation may be taken into account when

determining whether or not retained earnings and profits exceeded the reasonable needs of the business. See sec. 1.537-1(a), Income Tax Regs. Respondent, accordingly, reduced petitioner's current taxable income by the amount of dividends that were actually paid when respondent determined petitioner's tax deficiency. No further accumulation for this purpose has been justified by petitioner.

C.  Conclusion

Based upon the record before us, we conclude that petitioner's accumulated earnings and profits that were available during the years in question did not exceed the reasonable needs of its business. Petitioner's reasonable needs are summarized in the chart below:

|  | 1995 | 1996 | 1997 |
|---|---|---|---|
| Net liquid assets | $ 4,970,026 | $ 4,732,151 | $ 4,909,323 |
| Less reasonable needs: | | | |
| 1.  Operating cycle | (3,735,858) | (3,863,010) | (3,737,075) |
| 2.  Stock redemption | (1,975,750) | (2,044,847) | (1,697,657) |
| 3.  Class action lawsuit | (100,000) | -0- | -0- |
| 4.  Business expansion | -0- | -0- | -0- |
| 5.  Repairs & renovations | (74,669) | (70,445) | (34,024) |
| Excess accumulated earnings & profits | $ (916,251) | $(1,246,151) | $ (559,433) |

We are satisfied that the reasonably anticipated needs of petitioner's business substantially exceeded petitioner's available net liquid assets. We conclude that petitioner was not availed of for the purpose of avoiding income tax with respect to its shareholders and, thus, not subject to the accumulated earnings tax imposed by section 531.

We have carefully considered all remaining arguments made by both parties for a result contrary to those expressed herein, and, to the extent not discussed above, they are irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner.</u>